## CENTMONT CORPORATION v. MARSCH.
### No. 2839.

Circuit Court of Appeals, First Circuit.
Dec. 15, 1933.

Walter A. Dane, of Boston, Mass., for appellant.

Ralph E. Tibbetts, of Boston, Mass., for appellee.

Before WILSON and MORTON, Circuit Judges, and HALE, District Judge.

WILSON, Circuit Judge.

On March 30, 1926, the Central Vermont Railway Company, which will hereinafter be referred to as the Central Vermont, as complainant, filed a creditor's bill in the District Court of Massachusetts against the Southern New England Railroad Corporation, which will hereinafter be referred to as the Southern New England, except when it may be necessary to distinguish it from a Rhode Island corporation having the name of the Southern New England Railway Company, alleging that it was threatened with a multiplicity of suits that would lead to wasteful strife and controversy, and would dissipate its assets, and asked that receivers be appointed to preserve its assets and reduce them to cash, determine the amount of outstanding claims and liens, and that the receivers be given such general powers as are usually bestowed upon them under similar conditions.

On the same date the respondent, the Southern New England, filed its answer admitting the allegations of the bill, and consented to a decree appointing receivers.

The receivers on January 1, 1931, reported cash on hand in the sum of $235,218.41. On October 22, 1931, the receivers reported that pursuant to an order of court the following creditors had filed proofs of claim: The Standard Oil Company of New York for $150; the receivers of the Central Vermont for $2,504,894.70, and an amended and corrected proof of a claim of $4,170,148.51; and John Marsch a claim based on a judgment against the Southern New England of $681,-197.60. The receivers recommended the allowance of each of the three claims, except that it was agreed that the claim of Marsch should be allowed only for the amount of a judgment he had already recovered against the Southern New England, to wit, $622,359.-28, for the balance due him under a contract for the building of a railroad in the commonwealth of Massachusetts from the town of Palmer to the Rhode Island boundary at Blackstone, in which suit he recovered judgment in the amount of $622,359.28.

Prior to the above report of the receivers, the Centmont Corporation, as assignee of the claim of the Central Vermont, was permitted to become a party plaintiff.

On October 27, 1931, Marsch filed objection to the report of the receivers as to the allowance of the claim of the Centmont Corporation as assignee on the following grounds:

(1) The Centmont Corporation was not entitled as a creditor to share in the assets in the hands of the receivers on a parity with other creditors.

(2) That, if a creditor, the amount it was entitled to receive was substantially less than that recommended for allowance by the receivers.

(3) That, if it were allowed to share in the assets, it was not entitled to interest on the principal of its claim.

(4) That the interest on its claim as computed by the receivers was erroneous.

By order of court under date of December 29, 1931, the issues raised by the objections of John Marsch were referred to H. La Rue Brown, Esq., as master, to examine the evidence and vouchers in support of the claim in dispute, and in support of the objections, and to report to the court his findings of fact thereon. The order was afterward amended and required the master to report to the court all the evidence bearing upon any question of fact which any party might request, and such other portions of the evidence as might be material to any requests for rulings or other questions of law which any party might desire to present to the court.

The master, on June 7, 1932, filed a very clear, complete, and detailed report, in which he stated, in substance, that the claim of the Standard Oil Company for $150, and that of John Marsch for $622,359.28, should be allowed as recommended by the receivers; that the only disputed issues before him were: (1) Whether the claim of the Centmont Corporation should be allowed for any amount against the objection of John Marsch on the ground that the Southern New England was merely a subsidiary and instrumentality of the Central Vermont, through which the latter undertook to construct a railroad within the limits of Massachusetts, and therefore was not entitled to share in the assets of the Southern New England on a parity with bona fide creditors; (2) if the Centmont Corpora-

tion was entitled to share as a creditor, the correct amount of its claim; (3) whether interest should be allowed on the principal sum, and in what amount; and (4) as later developed, the contention of the appellant that Marsch was estopped from setting up the objection that the Centmont Corporation was not a creditor by presenting his claim to receivers appointed in a suit brought by the Central Vermont as a creditor, and admitted to be such by the respondent; and also from contending that the Southern New England was merely a subsidiary and agent of the Central Vermont by the rulings on demurrers in cases in the Massachusetts Courts brought by Marsch against the Southern New England, the Grand Trunk Railway Company, the Central Vermont Railway Company, and against all three jointly. The master found that the Southern New England was merely an instrumentality of the Central Vermont for the building of the railroad, and could not in equity prove its claim against the funds in the hands of the receivers of the Southern New England.

To clear away the objection that Marsch has no standing as an objector to the claim of the Centmont Corporation, before considering the merits of the objections of Marsch to the allowance of the appellant's claim, it should be noted that Marsch was not a party to this action when it was originally brought, and, until the receivers reported that they recommended the allowance of the Centmont Corporation's claim, Marsch's interests were not adversely affected. Even if it be determined that the Central Vermont or its assignee, the Centmont Corporation, is not a creditor of the Southern New England and cannot share in the assets of the Southern New England as against bona fide creditors, the Central Vermont owned all the capital stock of the Southern New England, and could properly bring the suit, since it was entitled to the balance of the assets, if more than sufficient to pay all claims of creditors duly allowed. In any event, a court of equity, having taken jurisdiction, will retain it to protect the interest of such creditors as are entitled to share in the assets.

We do not think the rulings of the Massachusetts court in the cases above referred to estop Marsch from presenting his objection in this action to the allowance of the claim of the Centmont Corporation. These proceedings, though the same parties or their privies are involved, do not involve the right of recovery by Marsch against the Central Vermont on his contract with the Southern New England. The Massachusetts court appears to have assumed from the declarations in these three cases that the motive of the Central Vermont in organizing the Southern New England was to escape or limit its liability for the acts and contracts of the Southern New England. Such a motive is entirely different from that found to exist by the master in this case.

While the Massachusetts court held there were not sufficient facts alleged in the actions against the Grand Trunk Railway Company and the Central Vermont Railway Company to warrant a judgment against them, since Marsch's contract was with the Southern New England, a separate corporate entity, it does not appear that all the facts found by the master bearing on the relations between the Central Vermont and the Southern New England were alleged in the actions against either of the two railroad companies last named. The Massachusetts court also sustained a demurrer in the action against the three corporations jointly, but on the ground that the Southern New England was described therein both jointly as a principal with the other two railroad companies and also as their agent, and it could not properly be joined as both principal and agent.

The rulings of the Massachusetts court in these cases went no farther than to hold that the holding by one corporation of all the capital stock of another and the management of both by the same executive officers did not alone constitute the holding company a principal and the subsidiary corporation as agent. It has recently indicated, however, in Hallett et al. v. Moore et al., 185 N. E. 474, 482, that although stock ownership claim may not be sufficient to render a subsidiary corporation an agent of the holding corporation, "there are instances where courts look through the corporate form to the individuals in order to protect the public, prevent a fraud, or to accomplish some other essential justice."

The question here is, whether the District Court, upon the facts found by the master, was warranted in holding that the Central Vermont so dominated the Southern New England that, except in form, the acts of the Southern New England were the acts of the Central Vermont; and in equity, as against bona fide creditors of the Southern New England, it could prove a claim against that corporation for moneys advanced to it to build an extension of the railroad system of the Central Vermont and Grand Trunk Railway which, under the laws of Massachusetts, the Central Vermont could not do itself, at least,

without special legislation, and to construct which it caused the Southern New England to be organized and the acts of which it absolutely controlled.

■ Estoppel by a judgment must either appear on the face of the record or be shown by extrinsic evidence that the precise question was raised and decided in the former suit. Pennsylvania Canal Co. v. Brown (C. C. A.) 235 F. 669, 673; Russell v. Place, 94 U. S. 606, 608, 24 L. Ed. 214; Cromwell v. County of Sac, 94 U. S. 351, 353, 24 L. Ed. 195; Harrison v. Remington Paper Co., 140 F. 385, 400, 3 L. R. A. (N. S.) 954, 5 Ann. Cas. 314. We have nothing before this court showing what the facts were in the Massachusetts cases, except as they appear in the opinion of the court.

We agree with the District Court that it is not shown that, upon the facts found in this case, the same issue was necessarily decided in the Massachusetts cases, and that Marsch, therefore, is not estopped from objecting to the allowance of the Centmont Corporation's claim in this suit by the rulings of the Massachusetts court on the demurrers in the actions brought by Marsch in the Massachusetts court.

■ We now come to the issue of whether the Centmont Corporation, as assignee of the claim of the Central Vermont, is in equity entitled as a creditor to share in the assets of the Southern New England on a parity with bona fide creditors.

The facts found by the master, as to the organization and the conduct of the Southern New England's affairs in the building of the railroad out of which these claims arose, are substantially as follows:

In 1910 the Central Vermont already operated a line of railway running from a connection with the Grand Trunk system at St. Albans, Vt., to tidewater at New London, Conn., with certain branches. The Central Vermont had a close financial relationship to the Grand Trunk Railway, the exact details of which are not disclosed in the record. A plan was formed by the Grand Trunk-Central Vermont interests to build a line of railway from Palmer, Mass., to Providence, R. I., via Blackstone. At Providence connection was to be made by steamboat with New York, and a rather elaborate development of coastwise and foreign water carriage was contemplated. A line from White River Junction to Boston was also proposed. The whole plan gave the Grand Trunk new and direct connection over controlled lines to the all-year ports of Bos-

ton and Providence, and created a great stir in railroading, industrial, and financial circles in New England.

By the laws of Massachusetts a railroad could only be built by a domestic corporation. The Central Vermont was not a domestic corporation. It, or the Grand Trunk Railway which controlled it, caused the Southern New England to be organized for the sole purpose of constructing the new road from Palmer to Blackstone in Massachusetts, and a Rhode Island corporation to complete the line to Providence. Once constructed, it would have been operated and controlled by the Grand Trunk Railway as a part of its system, or by its subsidiary, the Central Vermont, either directly or indirectly, through the Massachusetts and Rhode Island corporations.

It is urged by the Centmont Corporation that its claim grew out of advances made to the Southern New England by the Central Vermont to enable the Southern New England to complete construction of the railroad; that the fact that the Central Vermont owned all the capital stock of the Southern New England, and its executive officers were the same, and the board of directors were the same, or that members of the board of directors of the Central Vermont, at least, constituted a majority of the board of directors of the Southern New England, did not make the Southern New England a mere alter ego, instrumentality, or agent of the Central Vermont.

■ There are many cases in the books where this issue has been considered, and it is obvious that the result depends upon the facts in each case. The rule is often laid down that mere stock ownership or identity of executive officers will not alone be sufficient to establish one corporation as the agent or instrumentality of another. But it is equally well settled where, in addition, it appears that the business carried on by the subsidiary is a part of the business of the holding company, and the holding company dominates the affairs of the subsidiary through its stock ownership and common officers, and actually directs the affairs of the subsidiary as a part of its own business, for which purpose the subsidiary was organized, that the courts will look through the corporate form and hold that in such cases a subsidiary is a mere adjunct to or instrumentality for carrying on the business of the holding company.

In the case of United States v. Reading Co., 253 U. S. 26, 62, 40 S. Ct. 425, 434, 64 L. Ed. 760, the court said:

"It results that it may confidently be stated that the law upon this subject now is that

while the ownership by a railroad company of shares of the capital stock of a mining company does not necessarily create an identity of corporate interest between the two such as to render it unlawful under the commodities clause for the railroad company to transport in interstate commerce the products of such mining company, yet where such ownership of stock is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, or instrumentality or department of another company, the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require. United States v. Lehigh Valley R. R. Co., 220 U. S. 257, 272, 273, 31 S. Ct. 387, 55 L. Ed. 458; United States v. Delaware, Lackawanna & Western R. R. Co., 238 U. S. 516, 529, 35 S. Ct. 873, 59 L. Ed. 1438; Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Association, 247 U. S. 490, 501, 38 S. Ct. 553, 62 L. Ed. 1229."

In Chicago, Milwaukee & St. Paul Ry. Co. et al. v. Minneapolis Civic & Commerce Association, 247 U. S. 490, 500, 501, 38 S. Ct. 553, 557, 62 L. Ed. 1229, the court said:

"Much emphasis is laid upon statements made in various decisions of this court that ownership, alone, of capital stock in one corporation by another, does not create an identity of corporate interest between the two companies, or render the stockholding company the owner of the property of the other, or create the relation of principal and agent or representative between the two. * * *

"While the statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies. United States v. Lehigh Valley R. R. Co., 220 U. S. 257, 273, 31 S. Ct. 387, 55 L. Ed. 458; United States v. Delaware, Lackawanna & Western R. R. Co., 238 U. S. 516, 35 S. Ct. 873, 59 L. Ed. 1438. In such a case the courts will not permit themselves to be blinded or deceived by mere forms or law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."

The rule is frequently stated in the following terms:

"(1) The legal fiction of distinct corporate existence will be disregarded, when necessary to circumvent fraud. (2) It may also be disregarded in a case where a corporation is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality or adjunct of another corporation." In re Watertown Paper Co. (C. C. A.) 169 F. 252, 256.

The same rule is laid down in the following cases: Hunter v. Baker Motor Vehicle Co. et al. (D. C.) 225 F. 1006, 1015; Industrial Research Corp. v. General Motors Corporation et al. (D. C.) 29 F.(2d) 623, 625; Edward Finch Co. v. Robie (C. C. A.) 12 F.(2d) 360; New York Trust Co. v. Carpenter (C. C. A.) 250 F. 668, 672. Also see Martin v. Development Co. of America (C. C. A.) 240 F. 42; United States v. Lehigh Valley R. R. Co., 220 U. S. 257, 273, 31 S. Ct. 387, 55 L. Ed. 458; Clere Clothing Co. v. Union Trust & Savings Bank (C. C. A.) 224 F. 363, 366; Gulf, C. & S. F. Ry. Co. et al. v. Cities Service Co. et al. (D. C.) 281 F. 214.

█ It is unnecessary to add to the authorities in support of the rule that, where a subsidiary corporation is organized for a special purpose by a corporation which holds all its capital stock, and dominates and controls its affairs in carrying out its own business purposes, the subsidiary may be held to be a mere instrumentality for that purpose, and the court will disregard the corporate form and do justice between the corporation and third parties.

It is obvious that the Southern New England was organized at the instance of the Central Vermont to build a line of railroad from Palmer to the Rhode Island boundary.

On the date of the organization of the Southern New England, July 27, 1911, the directors of the Central Vermont passed a vote "to pledge the credit of the Central Vermont to obtain funds to purchase the capital stock of the new corporation, and to pay for the purchase of the right of way * * * and for such other expenses as shall become necessary * * * in the promotion and construction of the railroad of said corporations."

By stipulation the parties agree that in a petition by the Central Vermont to the Public Service Commission of Massachusetts it was

stated under oath that all the money for the construction of the railroad, both in Massachusetts and Rhode Island, was furnished by the Central Vermont, and was borrowed by it from the Grand Trunk Railway.

As a further indication that the Southern New England was a mere instrumentality for carrying out a project which the Central Vermont or the Grand Trunk Railway could not do in Massachusetts, the master found that, while the meeting for the organization of the Southern New England was held in accordance with the laws of Massachusetts, and the stockholders met each year to elect officers, no corporate record is found that any business was done by the directors or executive committee or stockholders of the Southern New England, except to authorize or take such action as was required by the laws of Massachusetts or to fill vacancies in offices.

The claim of the Central Vermont is made up from its charges on its books to the Southern New England and not from any notes or other acknowledgment of indebtedness by the Southern New England, except as the same accountants made debit or credit charges on both sets of books.

While two sets of books were kept, they were kept in St. Albans, the headquarters of the Central Vermont, and under the supervision of the chief accountant of the Central Vermont, who was also elected or appointed chief accountant for the Southern New England.

The balance sheets of the Southern New England do not indicate that during or after 1913, and until the completion of the railroad was abandoned, it handled much cash; and the master's report discloses that much of the expense of construction was paid directly by the Central Vermont and charged on the books to the Southern New England.

The salary of the president of both companies was paid by the Central Vermont, and a certain proportion charged to the Southern New England, though no record of any action by the board of directors or stockholders fixing any salary of its president appears. The master did not specifically find that the salaries of the other executive officers were handled in the same way, but assumed they were, as they acted for both corporations.

Other practices in connection with the relationship between the Central Vermont and the Southern New England certainly were not the usual and customary methods of conducting the business of a separate corporate entity, or exercising the control resulting merely from stock ownership. The contract for the building of the railroad does not appear from the records to have had the prior authorization of the directors or stockholders of the Southern New England, but was entered into by its president, who was also the president of the Central Vermont. The payment for the capital stock and its issue was not in accordance with the usual course in the case of an independent corporate entity. The bills for construction were not always even paid by the Southern New England in the first instance. The evidence disclosed over nine hundred instances where the bills were first paid to third parties by the Central Vermont and then debited to the Southern New England. As a matter of bookkeeping, at least, cash was shuttled back and forth between the two corporations, presumably to suit the needs of the Central Vermont. The record discloses that the Southern New England in several instances returned money to the Central Vermont in large sums after it had been advanced to it. It also disclosed that the Southern New England, though organized to build a railroad, advanced to the Southern New England Railway Company, the Rhode Island corporation, nearly $400,000 in 1913 to enable that corporation to construct the new railroad from Blackstone to Providence. These advances were undoubtedly a shifting by direction of the Central Vermont of moneys from one of its instrumentalities to the other, at its pleasure. It was largely from this indebtedness that funds now in the hands of the receivers have come through the receipt of a dividend from the receivers of the Rhode Island corporation.

The issue of its capital stock to the Central Vermont was not actually authorized until 1916. It was first subscribed for by the Grand Trunk Railway and appears to have been debited on its books to both the Grand Trunk Railway and the Central Vermont. It was first issued in 1911 to three trustees. A part of the advances to the Southern New England was, as a matter of bookkeeping, credited to the Central Vermont as payment for capital stock. Upon learning that the laws of Massachusetts did not permit the ownership of the capital stock by a foreign corporation, the Massachusetts Legislature in 1916 authorized the acquiring of the stock by the Central Vermont, subject to the approval of the Massachusetts Department of Public Utilities.

In this connection one of the most significant pieces of evidence bearing on the rela-

tions between these corporations, and properly admitted, we think, over the objection of the claimant, is the record of the hearing before the department of public utilities of Massachusetts in 1916, on the petition of the Central Vermont signed by its president, E. C. Smith, to approve the issuance of the capital stock of the Southern New England to the Central Vermont, at which hearing J. W. Redmond, Esq., general counsel for the Central Vermont, and its president, E. C. Smith, appeared. In urging the approval of the issuance of stock to the Central Vermont, counsel for the Central Vermont stated, among other things: "That the Grand Trunk Railway Company controlled a majority of the stock of the Central Vermont Railway Company; that the Central Vermont wanted to build a railway from Palmer, Massachusetts, to Providence, Rhode Island, and incorporated the Southern New England Railroad Corporation in Massachusetts, which would own the property from Palmer to Blackstone, and the Southern New England Railway Company in Rhode Island for that purpose; that this corporation was designed to be a mere subsidiary and that it was 'the hand by which the Central Vermont built this railway which was designed to be a part of its system of transportation'; that the Southern New England Railroad Corporation is a 'mere tool of the Central Vermont Railway Company'; that what was sought in the petition was to secure for the Central Vermont Railway Company legal control of the Southern New England Railroad Corporation, 'which we have built and put our money in'; that 'what we are trying to do is to get control of our own subsidiary corporation, which stock was issued solely for the purpose of operating from Palmer to Providence.'"

It is not claimed that any fraud was intended by so doing, but the master found: "That the Southern New England was a wholly owned subsidiary which was intended to be and was an instrumentality for carrying out the purpose of the Central Vermont to acquire and control a connection between its line at Palmer and Providence, Rhode Island, and that the purpose was reflected by the resolution of the Central Vermont's board of directors adopted July 27, 1911." Its clearly

established purposes, however, were to control the Southern New England and direct the construction of the railroad by holding all its stock; electing its own executive officers as executive officers of the Southern New England; and its directors as a majority, at least, of the board of directors of the Southern New England; by furnishing all the capital for the building of the railroad, and providing engineers to superintend the contract, and the loose manner in which the corporate affairs of the Southern New England were conducted. It would be difficult to conceive of any more complete domination of one corporation by another and still maintain a separate corporate existence than is shown in this record.

It is unnecessary to cite further findings of specific facts by the master in support of his conclusion and that of the District Court, that the Southern New England was a mere instrumentality of the Central Vermont and was completely dominated by it, and all the acts of the Southern New England were the acts of the Central Vermont, except in form, and were done in furtherance of a policy and project of the Central Vermont and Grand Trunk Railway.

Equity and justice, also, we think, require the affirmance of the decree of the District Court. The funds in the hands of the receivers were advanced by the Central Vermont for the construction of the railroad that Marsch entered into a contract to build. The project was abandoned during the World War, and Marsch, though he completed his contract in December, 1915, will, in any event, be a heavy loser, resulting from the failure of either the Central Vermont or the Grand Trunk Railway to advance further money to the Southern New England to carry out the entire project. To permit the Central Vermont now to receive a large proportion of the funds originally advanced to the Southern New England to build the railroad would be neither justice nor equity, and, in our view of the case, as the District Court held, would, in effect, be permitting the Central Vermont, through its assignee, to prove a claim against itself.

The decree of the District Court is affirmed, with costs.