**ST. LOUIS UNION TRUST CO. et al. v. OREGON ANNUAL CONFERENCE OF THE METHODIST EPISCOPAL CHURCH et al.**
No. L–12157.

District Court, D. Oregon.
Dec. 17, 1935.

Nagel, Kirby, Orrick & Shepley, of St. Louis, Mo., and McCamant, Thompson & King, of Portland, Or., for plaintiffs.

Reynolds, Flegel & Smith and Phelps & Burdick, all of Portland, Or., for defendants.

JAMES ALGER FEE, District Judge.

An action at law was instituted in this court by plaintiffs as trustees of the holders of bonds executed by Wesley Hospital.[1] Upon stipulation, a trial was held by the court without the intervention of a jury.

The Conference passed a resolution in 1924 referring to the need for a hospital in Coos Bay Region and appointing a Board of Hospitals and Homes, one of whose members was to investigate and make report to the bishop and the board, who were authorized to establish such an institution and to appoint a board of directors therefor subject to confirmation by the Conference.

Pursuant thereto, Wesley Hospital, a charitable corporation, was formed, the directors of which were appointed under the authority granted. Negotiations were had for a loan from Bitting & Co. of $70,000 for the construction of the hospital and nurses' home. This was reported by the board to the Conference, and the report was accepted and the members of the board were confirmed in their places. These negotiations were carried on by Dr. Davis of the General Board, the bishop, and the Conference Board. Upon consummation, a deed of trust was given by the hospital covering an issue of bonds executed by it for the sum in question. This was done with the full concurrence and co-operation of the Conference Board and the bishop. The latter wrote a letter indicating his agreement and accepting the obligation as one of the Conference. When the checks were written by Bitting & Co., they were made out to the "Board of Hospitals and Homes of the Oregon Conference for Wesley Hospital," but were indorsed by members of the Hospital Board alone.

---

[1] "The Oregon Annual Conference of the Methodist Episcopal Church, an Oregon Corporation," is referred to as the the "Conference," "Wesley Hospital" as the "Hospital," the "Board of Hospitals and Homes of the Oregon Annual Conference" as the "Conference Board," the "Board of Directors of Wesley Hospital" as the "Hospital Board," and the "Bishop of the Methodist-Episcopal Church, Resident in the Portland Area thereof," as the "Bishop." The person referred to by this designation is Bishop W. O. Shepard in each instance except where the contrary is noted.

Bitting & Co. advertised and sold this issue to the public as an "obligation" of the Conference, without objection at the time. The financial affairs drifted into catastrophic condition and funds could not be obtained. After this state of affairs had developed, Mr. Phelps, attorney for the Conference, and himself a member of the Conference Board and the Hospital Board, wrote to the bonding company and protested the use of the phrase. In a subsequent letter he said the loan was neither a legal or moral obligation of the Conference. To this construction, Bitting & Co. strenuously objected. The necessity for refinancing became immediate owing to the existence of liens upon the building.

Bitting & Co. were again contacted by Dr. Davis and expressed their willingness to refinance the obligation to the extent of $110,000. Since the question had been raised, they however, were insistent that absolute acknowledgement of the obligation be had through appropriate agents from the Conference. A representative of the company, Mr. McCauley, was sent to Marshfield where a joint meeting of the Hospital Board and the Conference Board was held. At this meeting McCauley set out definitely that the money would not be loaned unless the debt was accepted as an obligation of the Oregon Conference. Dr. Davis was also present, as was the Bishop. McCauley was requested to retire from the meeting while the proposition was debated. Afterward the representative of Bitting & Co. was informed that his terms were met. He thereupon proceeded to Portland, where, after considerable hesitation, the Bishop and the president of the Conference Board, acting upon the advice of Mr. Phelps, the attorney for the Conference, signed similar statements expressing the obligation of the Conference in positive language.[2] Each also authorized his state-ment to be printed upon the bonds when issued over his own signature in fac simile. The attorney for the Conference, Mr. Phelps, wrote a letter to Bitting & Co. wherein he stated it as his opinion that the bonds were the obligation of the Conference. Based upon the reports which they had received of the happenings at the joint meeting of the boards, the attorneys of Bitting & Co. drew up minutes expressing the matters in a form satisfactory to the company and transmitted these to Dr. Seavey, secretary of the Conference Board, and to Mr. Huggins, secretary of the Hospital Board. After changes were suggested, each of the secretaries transmitted these identical minutes, with his certification under oath thereon, that the action had taken place in the meeting.[3]

At the trial, Dr. Seavey produced other minutes which made no mention of the fact that such action had been taken. He swore these were the actual minutes of the meeting. Mr. Huggins, secretary of the other board, also produced minutes which did not contain the formal entry, but had a place left for insertion. Neither could remember at the trial the details of the meeting except as represented by the minutes.

Bitting & Co. again advertised the new issue of bonds as obligations of the Oregon Conference and sold them to the present holders, subject to the powers of the trustees by reference to the deed of trust given by Wesley Hospital, which alone signed the bonds. The statements of the Bishop and the president of the Conference Board were printed on the bonds.

The minutes of the Conference each year contain reports of the Conference Board with relation to the condition of the Hospital, financially and generally. The Conference yearly approves these reports and appoints the members of the

---

[2] "The within bond, issued by Wesley Hospital, Marshfield, Coos County, Oregon, an eleemosynary institution owned by the Oregon Conference of the Methodist-Episcopal Church, at the request of and with the approval of the Board of Hospitals and Homes of said Conference constitutes a legal, valid and binding obligation of said Conference, for the payment of which the full faith and credit of said Conference, acting through its Board of Hospitals and Homes, and the Board of Trustees of its Wesley Hospital is pledged."

One was signed "A. L. Howarth, President of the Board of Hospitals and Homes of the Oregon Conference of the Methodist-Episcopal Church," and the other, "W. O. Shepard, One of the Bishops of the Methodist-Episcopal Church, and Resident Bishop within the Portland Area thereof."

[3] One of the Secretaries says: "Due to the fact that the Hospital was in such stringent financial circumstances at the time and the signing of this paper seemed to be the only thing that was holding up the loan" the minutes were certified.

Hospital Board. It regulates the affairs of the institution and makes important changes in management and other matters of detail. An order is entered directing the employment of an executive secretary by the bishop "to look after the finances of the hospital." A campaign by an outside agency to raise money for the hospital is approved. The Conference expressly authorizes the reception of specific gifts for the hospital and approves the appropriation of general funds devoted to the World Service Fund and of other money to be raised to pay upon this debt and retire maturing bonds. It directs that certain legacy which is expected by the hospital be used to pay this capital debt. A report is approved which states that the indebtedness here contested was made after a series of conferences "which included Bishop Shepard, Dr. N. E. Davis of the General Board of Hospitals and Homes, officials of the Conference Board and the local Board of Directors."

In a resolution set out in the minutes of the Oregon Annual Conference for the year of 1932, the situation of this bond issue and the necessity of refinancing was set forth, the floating of a new bond issue to repay it was approved and the Conference Board and the Hospital Board were authorized to take the necessary steps toward consumation.[4]

Pursuant to this resolution an advance of $1,500 was received upon a note signed in the name of the Conference by the president and secretary of the board.[5]

Thereafter this financing scheme was not pursued and the hospital becoming further involved, was closed by action of the Conference Board. The Conference then denied its obligation and the author-

[4] A portion of this resolution reads:

"In view of the above facts it was resolved that the Oregon Annual Conference of the Methodist Episcopal Church does hereby approve the floating of a new bond issue by Bitting & Company in the sum of $98,000 with interest thereon at not to exceed 6% per annum, to be secured by a first mortgage loan on the property of Wesley Hospital at Marshfield, Oregon, the principal sum to be due and payable ten years after date, said bond issue to be used for the purpose of retiring the present bond issue, and the additional bonds over and above those necessary to retire the present bond issue, to be used for the purpose of paying the unsecured creditors of said hospital, and for other purposes.

"It was further agreed and ordered that the J. S. Gray bequest shall be used when it matures to apply on the liquidation of this indebtedness.

"It was further ordered that the Conference Board of Hospitals be authorized to borrow in anticipation of the issuance of the aforesaid new bonds.

"It was further ordered and resolved that the Conference does authorize the Board of Hospitals and Homes of the Oregon Annual Conference, and the Board of Directors of the Wesley Hospital, to take all necessary actions in order to secure said bond issue, as aforesaid, with full power to do each and all things necessary in the floating of this bond issue."

[5] The note is as follows:

"$1500.00          St. Louis, Missouri,
                        "24th June, 1932.

"On, or before, February 1, 1933, after date, without grace, the Oregon Annual Conference of the Methodist Episcopal Church, an Oregon Corporation, promises to pay to the order of Bitting & Co., the sum of Fifteen Hundred Dollars ($1500.00) in Gold Coin of the United States of America, of the present standard value, with interest thereon, in like Gold Coin, at the rate of six per cent (6%) per annum from date, until paid, for value received; interest to be paid at the maturity of this Note; both principal and interest of this Note to be payable at the First National Bank in St. Louis, Missouri.

"This note, and the interest hereon to accrue, constitutes a direct obligation of the Oregon Annual Conference of the Methodist Episcopal Church, an Oregon corporation, and was authorized to be issued at a regular session held 23rd June, 1932, of the 80th Annual Meeting of said Corporation, in Portland, Oregon.

"Oregon Annual Conference of the Methodist Episcopal Church, thru its Board of Hospitals and Homes
"By [signed] M. A. Marcy, President
"Approved:
"[Signed] Titus Lowe
Bishop of the Methodist-Episcopal Church, Resident in the Portland Area thereof; and Presiding Officer of the 80th Annual Oregon Conference.
"Approved as to Legality:
"[Signed] T. M. Phelps
Attorney for Oregon Conference of the Methodist-Episcopal Church"

ity of its members who had sought to bind it. The security being waived, action was brought on the bonds and the debt against both the hospital and the Oregon Annual Conference. Both defended, but the liability of the hospital on the bonds is conceded by its answer. The only question is whether the Conference is also liable.

■ The nature of the complaint must primarily be considered. It bodies forth two causes of action. The first is founded on the negotiable instruments. The second is for money had and received. Both may be joined in one complaint.[6] No motion was made to strike the pleading for failure to state these causes separately.[7] Since a proper cause of action upon either theory was presented, neither motions to strike nor a general demurrer could avail and were therefore correctly overruled.[8]

■ The demurrer raised the question of the right of the trustees to bring action. Since fuller development has been given this point by the evidence, it will be considered upon the record as a whole. Although the terms are drawn from the same instrument, a clear distinction exists between the contract of Wesley Hospital and the plaintiffs on the one hand, and the trust agreement which arose between the seller of the bonds and the purchasers or the bearers. The payee unquestionably had a right to sue on the bond which he held, in the absence of contract. But by the reference to the trust deed, this right passed to the trustees who possessed it exclusively. The latter instrument may have bound the Conference by reason of the agency of Wesley Hospital. But in any event, when a bond was sold, a separate and distinct agreement of trust arose between the bearer or indorsee of the bond and plaintiffs. This new contract bound both of them, not only without regard to what parties originally had executed the deed of trust, but also without regard to the validity of such an instrument. If the seller

and buyer thus contracted with reference to a particular method of enforcement whereby plaintiffs were holders of the right of action on the bonds as "trustees of an express trust," the latter have the capacity to maintain this action.[9]

The right of the payees to bring an action on the original debt is well settled.[10] For if the substance be regarded, the money of the payee has been transmitted to the original receiver, and notwithstanding the fact that a negotiable instrument has been issued, the payee should have a right to sue on the original obligation in money had and received, without special assignment, subject only to defenses which would have been proper between the primary parties.

Under the agreement of trust which arose between each payee and the plaintiffs, this right upon the original obligation, also passed to the latter. It certainly is of no concern to defendant Conference. If the right passed, the Conference, assuming it to be liable, cannot be subjected to two recoveries any more than it could if only the right to sue on the bonds was transmitted. The language of the instrument which was incorporated by reference in the trust agreement between each payee and the plaintiffs is, that "the Trustees may take any other action which they deem advisable or to which they may be entitled by court proceedings or otherwise for the enforcement of the obligation of said bonds * * * No bond holder shall take any steps toward the recovery of the indebtedness hereby secured" unless he has taken measures of which there is no evidence. Under this pertinent language, the plaintiffs are vested with the legal title of all rights of action on the debt, the notes, or the trust deed.[11]

■ The first cause of action is upon the written instruments. One of the essential allegations is the execution of these negotiable bonds by the Conference. The only actual signature is that of Wesley Hospital through its president and secre-

---

[6] Oregon Code Annotated (1930) § 1-811; see Waggy v. Scott, 29 Or. 386, 45 P. 774.

[7] Oregon Code Annotated (1930) § 1-910. This is the only mode of taking advantage of a failure to state causes of action separately.

[8] See State v. Portland General Electric, 52 Or. 502, 95 P. 722, 98 P. 160.

[9] Oregon Code Annotated (1930) § 1-303.

[10] Eagle Bank v. Smith, 5 Conn. 71, 13 Am.Dec. 37; Chase v. Burnham, 13 Vt. 447, 37 Am.Dec. 602. Contra Battle v. Coit, 26 N.Y. 404, but see Dintruff v. Crittenden, 1 Thomp. & C. (N.Y.) 143.

[11] See McAdoo v. Oregon City Manufacturing Company (C.C.A. 9) 71 F.(2d) 879, 882–884.

tary. The statements of the bishop and the president of the Conference Board are only printed with fac simile signatures of these officers. These were not adopted as actual signatures, and were, from the contents of the statement, not intended as indorsements of either the Conference or the individuals. The signature of the Conference did not appear upon the bonds. In view of the plain wording of the statute, no recovery can therefore be had against the Conference upon the bonds.[12] This doctrine of the law merchant was formulated by custom and the judicial process into a rampart against a contention of the type now presented by plaintiffs. In this form, it was solidified by legislative action and is now impenetrable by the stream of federal judicial rationalization.[13] It is impervious likewise to the doctrines of liability of an undisclosed principal or of a disclosed principal to whom no addition to the actual signature refers.[14] Nor can the court, upon a bond so signed, disregard the corporate entity of Wesley Hospital.[15]

It has already been determined that the trustees for the bondholders have a right to sue upon the original debt. It must be then determined whether the Conference in any legal manner made itself liable in the first instance or later.

The Conference gave definite form to the hospital movement at Marshfield, by appropriating the impetus for its own glory. It initiated the idea of a corporation which was entirely under its domination and control, by its expressly reserved power of appointment and confirmation of all of the members of the Hospital Board set out in detail in the articles of incorporation of the hospital.

Wesley Hospital was thus incorporated. The Hospital Board named by the Conference Board and confirmed by the Conference took charge. The institution was eleemosynary in character. The Conference was not organized for profit and there was no hope of profit in this particular venture. Property had to be acquired and buildings erected. There was no method of paying for these, except by gifts obtained by the Conference[16] or by gifts and fees to the hospital or by a loan. The Hospital Board reported to the Conference that a loan of $70,000 was being negotiated. It is common knowledge that hospitals are considered next after churches as legitimate objects of church ownership and the articles of incorporation of the Conference mention them before churches. This property held by the hospital is variously described in the certificate of the bishop printed on the bonds as owned by the Conference and in the articles of incorporation of the Hospital,[17] as held in trust for it. Certainly, it was acquired for church purposes and so administered. One of the methods of holding property for such uses recognized by the discipline of the church is through trustees. Wesley Hospital held this real estate and appurtenances in trust for the Conference. By the law of the church, it was permissible for the Conference to mortgage lands and tenements so held, for church purposes. The members of the Conference knew from the

---

[12] Oregon Code Annotated (1930) § 57-118 "No person is liable on the instrument whose signature does not appear thereon * * *"

[13] Burns Mortgage Co. v. Fried, 292 U. S. 487, 493–495, 54 S.Ct. 813, 79 L. Ed. 1380, 92 A.L.R. 1193.

[14] Mineral Belt Bank v. Elking Lead, etc., Co., 173 Mo.App. 634, 642, 643, 158 S.W. 1066.

[15] See Lipman v. Manger, 185 Wis. 63, 70, 200 N.W. 663.

[16] The Articles of Incorporation of the Conference set out "The sources of its income are the voluntary contributions, bequests, and donations of benevolent persons together with all rents and interests of all property held by it and such tuitions and hospital fees and other such receipts as are proper charges upon its patrons."

[17] This provision empowers the Board of Directors to hold the property " * * in trust, for the use of the Oregon Annual Conference of the Methodist Episcopal Church, and according to the usages of the Discipline of said church as it now is, or as it from time to time shall be established, made and declared by the lawful authority of said church, and if said property be sold or encumbered property the proceeds of the sale or encumbrance shall be applied to the use aforesaid, subject, however, to the provisions of the laws of said church relating to abandoned church property and the rules and regulations adopted by the Board of Hospitals and Homes for the Methodist Episcopal Church." This language is taken from Section 354 on page 255 of the Discipline of the Methodist-Episcopal Church for 1924 relating to the acquisition and holding of property for Church purposes.

reports that this real estate could not be acquired and buildings erected thereon without the funds furnished by Bitting & Co.

Wesley Hospital was, therefore, incorporated as a branch or arm of the Conference to carry out a project deemed beneficial to the members of the latter. During the entire history of this institution, it operated, so far as this loan is concerned, as an agency of the Conference under direct control.

It is urged that the court disregard, upon this basis, the incorporation of Wesley Hospital and treat its assets as Conference assets, and its debts as Conference debts. The ordinary grounds of looking through the corporate entity in this fashion are the existence of fraud,[18] the intention to accomplish an unlawful purpose,[19] to evade existing debts,[20] or to protect a monopoly.[21] None of these elements appear in this case at the time of incorporation. Plainly the possibility of failure had not suggested itself. For the same reason, the purpose of the incorporation was not to limit financial responsibility of the Conference, but to have a convenient method of holding the property it expected to acquire. The modern instances have multiplied, where a parent corporation has been held for the acts of a subsidiary characterized by the courts as a branch, adjunct, or agency of the primary entity.[22] Without accepting this empirical theory definitely, the court holds that Wesley Hospital was the agency of the Conference in acquiring the real property and in constructing the buildings thereon and in negotiating these loans for the peculiar purposes of its principal. The Conference might as well have repudiated the mortgage as an unauthorized encumbrance upon property held in trust for it, as to deny the obligation of the loan of money to acquire these facilities.[23]

The loan was furthermore made not to the hospital directly, but to the Conference through its authorized agents. The checks were made out to the Conference Board for the hospital. It is true that the instruments were honored, upon the indorsement of the officers of the hospital alone. This circumstance is not only further proof of the agency of Wesley Hospital but is also direct evidence that Bitting & Co. transmitted the funds to the Conference itself.

This body had not in its minutes directly authorized the execution of instruments assuming this debt as its obligation.[24] On the other hand, it had designated agents to initiate and consumate the project of erecting and administering this hospital under its control.[25] It organized a Board of Hospitals and Homes for no other purpose than to confer upon this body, specific authority to establish and direct the hospital. The bishop is empowered by the fundamental law of the church "to oversee the spiritual and temporal business of the church." This official was directly designated by the Conference with the Conference Board to receive the report of investigation prior to the establishment of the institution. All of the details of the plan were to be worked out under the advisory supervision of the General Board of Hospitals and Homes of which Dr. Davis was executive secretary. There was, by these actions of the Conference itself, a positive designation of these persons and bodies as agents to establish the corporation, which also became an instrumentality of the Conference. There is nowhere an expression of limitation upon the plenary power of these agencies to effect the end in view.

After these agents were clothed with

---

18 Donovan v. Purtell, 216 Ill. 629, 637–640, 75 N.E. 334, 1 L.R.A.(N.S.) 176.

19 Brundred v. Rice, 49 Ohio St. 640, 650, 32 N.E. 169, 34 Am.St.Rep. 589.

20 Booth v. Bunce, 33 N.Y. 139, 88 Am. Dec. 372.

21 Northern Securities Co. v. United States, 193 U.S. 197, 353–354, 24 S.Ct. 436, 48 L.Ed. 679.

22 Commerce Trust Company v. Woodbury (C.C.A. 8) 77 F.(2d) 478, 487; Centmont Corporation v. Marsch (C.C.A.1) 68 F.(2d) 460, 466.

23 See McCallister v. Ross, 155 Mo. 87, 93–94, 55 S.W. 1027.

24 See Illinois Conference, etc., v. Henry Plagge, 177 Ill. 431, 436, 53 N.E. 76, 77, 69 Am.St.Rep. 252.

25 Lane et al. v. National Insurance Agency, 148 Or. 589, 596, 37 P.(2d) 365. See as to liability based upon action of an agent rendering a church liable by incurring an obligation in a collateral matter where empowered to proceed in the main transaction, Crescent Hill Presbyterian Church v. McDonald & Dodd, 144 Ky. 655, 658–660, 139 S.W. 849.

an indefinite authority to establish the hospital, all held themselves out as representatives of the Conference, with full power to act in obtaining a loan for the particular purpose and in numerous communications so construed their authority and the church law. The funds were first hired by the bishop, with the concurrence of the Conference Board through Dr. Davis, as executive secretary of the General Board. The instant loan was made with the concurrence of these persons and the Hospital Board and the Conference Board. The mere fact that the minutes of these bodies do not specifically show this action is a subterfuge which can not avail. Each is bound by the certification of the minutes by their respective secretaries.[26]

It is objected that the "Trustees" designated in the articles of incorporation, are solely empowered to handle the property of the Conference and incur obligations between sessions. But the Conference itself had supreme power at its sessions to carry out its own designs and agencies designated for that purpose which reported to the sessions were not under the control of the "Trustees." The latter were always disregarded in practice, not only in this transaction,[27] but in all others.

■ The attempt of congregations to escape liability for indebtedness incurred for the society, by persons not specifically authorized, is not novel in American church law. Such endeavors are inherent in such loose structures composed of persons of little business training, predisposed to look to the glory of the end desired, rather than to the consequences of failure. Under such circumstances, the judicial tendency has been to hold these bodies liable if the acts primarily unauthorized, have been ratified. But the debt must have been incurred in a project within proper church purposes. The sovereign authority must have been informed as to the facts,[28] although proof of this may be inferential. If these conditions concur simultaneously, any acts which indicate approval of a course of action or acknowledgment of the obligation is sufficient.[29]

■ Authority to assume a particular debt even without knowledge that the assumption has already been made by the agents at that time unauthorized ratifies such acts and binds the congregation.[30]

■ The mere fact that a promissory note has been given personally by another who alone is bound thereon will not protect the society from liability on the original debt, if incurred for its purposes and assumed by ratification of the unauthorized acts of its agents.[31] Recovery may be had upon the money counts where the corporation is not liable upon the note.[32] The instrument in such instances may be introduced in evidence.[33] The courts have then squarely held that the original obligation, even if unauthorized, may be assumed by any official acts which recog-

[26] In re New York Car Wheel Works (D.C.) 141 F. 430, 433. See Scott v. First Methodist Church, 50 Mich. 528, 533–534, 15 N.W. 891; Donnelly v. St. John's, etc., Church, 26 La.Ann. 738, 739 "neglect, incompetence, not to say dishonesty of a corporation in making up its minutes, can not" prevent the proof by parol of the action.

[27] See Moody & Meckelburg Co. v. Trustees of Methodist Episcopal Church, 99 Wis. 49, 51, 52, 74 N.W. 572. As a practical construction it will be observed that the promissory note given to secure the advance upon the abortive scheme of refinancing the present loan was signed not by the Trustees but by the officers of the Conference Board. This designates that body as the one empowered to act in this transaction.

[28] "Advised as to such indebtedness," Illinois Conference v. Plagge, supra, report showing full circumstances as to giving note; Donnelly v. St. John's, etc., Church, supra; "The society certainly knew of the mortgage," Moody, etc., Co. v. Trustees of Methodist Episcopal Church, supra; "They all admitted they knew it had been done," McCallister v. Ross, supra.

[29] Recognition in settlement, Episcopal Charitable Society v. Episcopal Church, 1 Pick. (18 Mass.) 371. Kept lands deeded, French v. Barre, 58 Vt. 567, 574, 5 A. 568. Entered and took possession of land upon which the contested mortgage was given, Rountree v. Blount, 129 N.C. 25, 27, 39 S.E. 631.

[30] Page v. Asbury Methodist Episcopal Church, 78 N.J.Eq. 114, 117, 78 A. 246; Scott v. First Methodist Church, supra.

[31] Episcopal Charitable Society v. Episcopal Church, supra; Illinois Conference v. Plagge, supra; see Cattron et al. v. First Universalist Society, 46 Iowa, 106, 108.

[32] Episcopal Charitable Society v. Episcopal Church, supra.

[33] See Cattron v. First Universalist Society, supra.

nize it as a debt of the society. Such a doctrine has been applied to various conferences of the Methodist-Episcopal Church,[34] in fact situations somewhat analogous.

 If it then be assumed that no authority can be found for the original acts of these representatives, the Conference is bound to pay the debt because it has ratified these transactions and assumed the obligation. Knowledge of all the pertinent facts concerning these loans can be found in the records of the Conference. Furthermore, public campaigns to sell the bonds had been twice carried on by Bitting & Co. during which literature had borne the statement that these instruments were obligations of the Oregon Conference, for the purpose of raising money from those who relied upon the moral qualities of the Methodist Church in Oregon. The second series likewise bore the direct statement of the bishop and the chairman of the Conference Board to that effect. Such open dealings cannot be passed over by a claim of lack of knowledge. All those members of the Conference who had any connection with the transactions knew of this assumption. There can be no proper distinction between the knowledge of these persons, as transactors and as members of the Conference. The minutes of that body show clearly that the details of the negotiation of the instant debt were laid before the members and means to liquidate the obligation were adopted.[35] The record is clear that the money had been borrowed for church purposes and expended on property held in trust for it.[36] Payments were made on principal and interest and the application of World Service Funds for that purpose was approved.[37] The definite adoption of the report that the loan in controversy was made after conferences in which all the agencies concurred, shows specific ratifica-

tion of all these acts. A complete plan laid down in the Conference minutes to refinance the whole debt as its own obligation was ratified, and the Oregon Conference received an advance thereon upon a note signed by the Conference Board. Liability upon this instrument was not denied.

The subsequent actions of the Conference are thus clearly within the lines of the decisions, and it has assumed the debt and ratified the acts of its agents.

Judgment is granted upon the original obligation for the full amount of the principal with interest at the rate of 6 per centum per annum against the Conference and Wesley Hospital.

---

[34] Scott v. First Methodist Church, supra; Moody, etc., Co., v. Trustees of Methodist Episcopal Church, supra; Wright v. Vineyard Methodist Episcopal Church, 72 Minn. 78, 79, 80, 74 N.W. 1015; French v. Barre, supra; Page v. Asbury Methodist Episcopal Church, supra.

[35] A separate obligation incurred in an unauthorized manner to pay a valid debt of the church is assumed if no action is taken to disaffirm. Wojciechowski v. Johnkowski, 16 Pa.Super. 444, 449, 450.

[36] Page v. Asbury Methodist Episcopal

Church, supra. An oral contract for completion of a church is ratified by use thereof, Bright v. Ruthenian Greek Catholic Congregation, 246 Pa. 156, 159, 160, 92 A. 131.

[37] Payments have been noted as a circumstance tending to show ratification in the following cases: Illinois Conference v. Plagge, supra; First Baptist Church v. Caughey et al., 85 Pa. 271; Episcopal Charitable Society v. Episcopal Church, supra; Moody, etc., Co. v. Trustees of Methodist Episcopal Church, supra; Scott v. First Methodist Church, supra.