**NICHOLS & CO. et al. v. SECRETARY OF AGRICULTURE.**

No. 3747.

Circuit Court of Appeals, First Circuit.

Nov. 19, 1942.

Edward C. Park and Withington, Cross, Park & McCann, all of Boston, Mass., for petitioners.

Robert L. Pierce, Sp. Atty., of Washington, D. C., James C. Wilson, Sp. Asst. to the Atty. Gen., Thurman Arnold, Asst.

Atty. Gen., Kenneth L. Kimble, Sp. Asst. to the Atty. Gen., and Robert H. Shields, Sol., Department of Agriculture, and Charles W. Bucy, Atty., Department of Agriculture, both of Washington, D. C., for respondent.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

Petitioners seek review of an order of the Secretary of Agriculture (actually the Assistant Secretary) suspending a registration of Nichols & Company, a partnership, as commission merchant under the provisions of the Commodity Exchange Act, 49 Stat. 1491, 7 U.S.C.A. § 1 et seq., hereinafter called the Act. The order was stayed pending the outcome of this appeal.

On February 14, 1941, the Assistant Secretary of Agriculture under the authority of the Act issued a complaint against Nichols & Company, Inc., hereinafter called the corporation, and against Nichols & Company, hereinafter called the partnership, both of Boston, Massachusetts.

The corporation since its organization has engaged in the merchandising of wool, both grease wool and wool tops. It trades in wool top futures under the rules of the Wool Associates of the New York Cotton Exchange, Inc. J. H. Nichols, A. O. Wellman and R. P. Hackett owned all of the capital stock of Nichols & Company, Inc., for themselves or as trustees for members of their families, except for one share issued to W. B. Southworth in April, 1940. The partnership was formed in 1935, at which time the only partners were Nichols, Wellman and Hackett. In February, 1937, W. B. Southworth was made a partner and in July, 1938, J. Harvey Wells became a partner. The partnership has been since July, 1937, registered as a futures commission merchant with the Secretary of Agriculture under the Commodity Exchange Act.

The complaint charged that the partnership was an instrumentality of the corporation and in conducting its business acted as agent for the corporation; that the corporation during the month of October, 1940, by its operations in wool top futures contracts on the Wool Top Exchange attempted to manipulate and did manipulate the price of October, 1940, wool top futures; that the corporation refused to grant access to certain of its records relating to purchases, as well as holdings, of spot wool and wool top futures, in order that the Commodity Exchange Commission might obtain necessary information to verify the correctness of the corporation's report indicating a hedging position, and might determine the relationship between its operations in wool top futures and spot wool; that the corporation by and through the means of the partnership on numerous occasions during the year 1940 became buyer with respect to selling orders of customers and became seller with respect to buying orders of customers in violation of Section 4b(D) of the Act; that the partnership engaged in the business of filling orders for wool top futures transactions received from customers by off-setting such orders against orders of other customers on numerous occasions in violation of the Act and the Regulations pursuant thereto; and that the partnership engaged in the practice of adjusting funds in segregation for customers to the exact amount of the net equities as computed daily, no consideration being given to the accounts in deficit, resulting in the firm being under-segregated during the month of October, 1940, and that the firm by this practice used the funds of wool top futures customers to margin the trades of other customers, all in violation of the Act.

A hearing on these matters was had before a Referee. He found that the corporation refused access to records required to be kept open, in violation of Section 4i of the Act; that through its agent, the partnership, the corporation took the other side of customers' trades in violation of 4b (D) of the Act, and that the partnership, an agent for whose acts the corporation is responsible, under Section 2a of the Act, off-set orders of some customers against orders of other customers, in violation of Section 4b(D) of the Act. The Referee did not find the corporation guilty of manipulating or attempting to manipulate the market nor did he find the partnership guilty of being under-segregated. The Secretary of Agriculture adopted substantially the conclusions of the Referee and ordered that the registration of the partnership as a futures commission merchant be suspended for a period of ninety days.

It is to be observed from the conclusions of the Referee and Secretary of Agriculture that the corporation was found to have failed to grant access to the records, and that the corporation by means of its

agent, the partnership, acted on the other side of trades without customers' consent. We are thus presented with the question whether the Secretary of Agriculture was justified on the basis of the record to attribute the wrongs of the corporation to the partnership. If the Secretary of Agriculture is in error on this point, it becomes unnecessary to consider these allegations separately. The Secretary of Agriculture in his findings of fact says:

"Nichols & Company is, and was in 1940, actually a part of, or agent of, Nichols & Company, Inc."

And in his report states:

"It was claimed that, since there is no expressed public policy against combining the business of a dealer and a futures commission merchant, there is no basis for disregarding the corporate entity and considering the partnership and corporation as one and the same, because no wrong is involved in considering them as separate entities. The law with respect to piercing the corporate veil does not require that we shut our eyes to the true facts of this case. No form of organization can obscure the fact that there is, in truth, just one business here."

In the oral argument before us petitioners contended that the Act which provides that "the findings of the Secretary of Agriculture as to the facts, if supported by the *weight of evidence*, shall in like manner be conclusive" (42 Stat. 1002, Ch. 369, § 6b, 7 U.S.C.A. § 9) gives us authority to consider the evidence *de novo* to determine for ourselves questions of fact. Counsel for the respondent in the oral argument contended that the term "weight of evidence" as used in the statute means "substantial evidence". The phrase "the findings * * * if supported by * * * evidence, shall * * * be conclusive" when found in statutes dealing with administrative agencies, has been held to mean that the facts shall be conclusive when supported by "substantial evidence"

and that the courts are not to reweigh the evidence or to draw inferences from the subsidiary facts.[1]

The argument of petitioners in this case has plausibility in that Congress has definitely used the words "weight of evidence" in contradistinction to such terms as "evidence" and "substantial evidence". We need not consider the merits of the relative positions because we believe that the Secretary of Agriculture was in error as a matter of law in treating the partnership and the corporation as one and the same business.

The funds required for the organization of the partnership were loaned to it by the corporation. It was formed for the purpose of executing the corporation's futures orders more easily than by putting them through outside brokers and for giving the corporation an opportunity to gain experience in handling futures. Until September, 1940, the corporation regularly loaned sums to the partnership, the balance at times exceeding $300,000. From the time of its formation through 1940, the partnership profits were distributed to Wellman, Nichols and Hackett in the exact ratio to the percentage of the corporate stock owned by them and their families. All partnership profits were so distributed until Southworth and Wells became partners, after which time all except the portions going to Southworth and Wells were so distributed. Prior to 1937, the partnership executed orders only for the corporation. On January 1, 1937, a separate office was opened for the partnership. This office is in a room in one corner of the office building floor occupied by the corporation and is referred to as the "Futures Room". The passageway between it and the corporation space is kept open. Upon Mr. Southworth's affiliation with the partnership, he was placed in charge of the futures business. He received 10% of the profits though he put up no capital. In 1939 and 1940 he allowed his share of the profits to accumulate as capital. He became a mem-

---

[1] National Labor Relations Act, 49 Stat. 453, § 10(e), Ch. 372, 29 U.S.C.A. § 160(e); Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Waterman S. S. Co., 309 U.S. 206, 208, 60 S.Ct. 493, 84 L.Ed. 704; Federal Trade Commission Act, 38 Stat. 720, Ch. 311, § 5, 15 U.S.C.A. § 45(c); Kidder Oil Co. v. Federal Trade Comm., 7 Cir., 117 F. 2d 892, 894; Federal Trade Comm. v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534. It is to be noted that no distinction is made between the terms "evidence" and "substantial evidence" in the statutes. See Securities Exchange Act of 1934, 48 Stat. 901, 15 U.S.C.A. § 78y in which the phrase "substantial evidence" is used. See Wright v. Securities and Exchange Comm., 2 Cir., 1940, 112 F.2d 89, 94.

ber of the Wool Top Exchange in September, 1937, and conferred the privilege of membership rates upon the corporation, entitling it to reduced commission rates on its futures trades instead of the full charges which it had been paying. For this he was made Assistant Treasurer of the corporation on August 4, 1938 but little of his time was devoted to the work of the corporation. Mr. Wells put in no capital but was entitled to 5% of the partnership profits with a minimum sum guaranteed. He is not an officer of the corporation and has no authority to trade for it except as orders are transmitted to him. By the end of 1940 the partnership had about 200 futures customers. It pays its own office rent, has its own telephone and maintains separate books. The employees who work for the partnership are not the same ones who are employed by the corporation and they receive their salaries from the funds of the partnership. In 1940 it executed 2,195 orders for the corporation and 10,190 orders for others. It has offices in New York and Philadelphia in which the corporation transacts no business.

It seems clear from the facts that Nichols, Hackett and Wellman are in control of the corporation and are equally in control of the partnership despite the fact that Southworth and Wells have some interest in it.

The problem before us is not unlike that faced by courts on numerous occasions in cases involving the question of the responsibility of a parent corporation for the acts of its subsidiary. Here a corporation and partnership are involved and instead of placing responsibility upon the parent, there is an attempt to attribute the wrong of the parent to the subsidiary. With these differences the question seems to be the same. There is, of course, nothing wrong, immoral or fraudulent in the establishment of a corporation and a partnership by the same persons; nor will the courts look behind the formal separateness of two businesses unless there are compelling reasons to do so, such as the commission of fraud or the evasion of statutory obligations. The underlying tests for determining whether a court will "lift the corporate veil" as it is sometimes expressed, has many times been stated. As was well said in Owl Fumigating Corp. v. California Cyanide Co., 3 Cir., 1929, 30 F. 2d 812, 813:

"The law which it invoked and applied to the facts is familiar and not open to dispute. It consists of rules which from the nature of the questions to which they apply are in the abstract, and are mainly negative in character. For instance, these rules declare that similarity or identity of corporate names does not alone disturb or bring together distinct corporate entities; that ownership of capital stock of one corporation by another does not alone create identity of interests or the relation of principal and agent between the two; that identity of officers does not alone establish identity of corporations and make one liable for the torts of the other; that the mere loan of money even in large amounts by one corporation to another does not alone make the borrower the agent of the lender or make the lender liable for the acts of the borrower; that participation by the lender in the management of the borrower's business for the purpose of protecting its debts does not make the lender liable for the borrower's debts. When, as against the general rule that two separately incorporated companies are separate and distinct entities, it is charged that one is a mere agency or department of the other and is used as an instrumentality to perpetrate fraud, justify wrong, avoid litigation or render it more difficult, or generally to escape liability for what are in substance its own acts, courts will put aside the screen and, looking upon the situation through the group of negative rules, determine affirmatively the truth and place responsibility where it actually belongs."

The fact that in the case at bar there is an identity of individuals who control the corporation and the partnership; that the offices of the partnership and corporation are on the same floor; that the corporation has granted loans to the partnership and that the partnership handled the corporation's futures business are not sufficient under the cases to warrant the ultimate conclusion of the Secretary of Agriculture that the partnership is merely a part of the corporation. Here the corporation is engaged in the manufacture of wool tops and trades on the market in wool top futures. The partnership is a commission merchant, whose business is not devoted entirely to the interest of the corporation. In fact, as we have pointed out, the major portion of its business is done with others than the corporation.

The record is clear that the partnership carries on a substantial business in its own right as a separate and distinct entity.

The corporation admittedly did not become a futures commission merchant. Instead, its three controlling stockholders with two other individuals formed a partnership to engage in a general business as futures commission merchant. This is not the same thing, legally or factually, as if the corporation had become a futures commission merchant. The five partners engaged in this business (entirely distinct from the business of the corporation) on their own responsibility and at the risk of their personal fortunes, and the corporation had no interest in the commissions earned by the partnership as a futures commission merchant.

The respondent cites cases in which the courts look behind the formal corporate set up but these cases are clearly distinguishable and in no way support its contention.

United States v. Milwaukee Refrigerator Transit Company, C.C., 142 F. 247, is a case in which a bill in equity was brought seeking an injunction to prevent the alleged payment of rebates on freight. The action was under the Elkins Act, 37 Stat. 847, Ch. 708, 49 U.S.C.A. § 41 et seq. The defense as outlined in the demurrers stated that it appeared on the face of the bill that the alleged rebates were not paid back to the shipper, the Pabst Brewing Company, but to the Refrigerator Transit Company, and in substance and effect were merely payment to a soliciting agent (the Transit Company) of a commission and was thus no violation of the Act. The bill charged that the Transit Company was a dummy corporation and was formed for the express purpose of securing rebates for the Brewing Company, which was charged with being in control of the Transit Company; that the rebates were accepted under the guise of commissions; that the Transit Company solicited business from no others; and that the Transit Company was created for the purpose of evading the Elkins Act. Defendant's demurrers were overruled because, as the court said, 142 F. at page 252:

"The allegations seem to me sufficient to call for plea or answer, so far as the question now under consideration is concerned."

On the basis of the bill, the court very properly stated (142 F. at pages 255, 256):

"Applying the rule here laid down to the circumstances shown to surround the brewing company and transit company, can it be doubted that there really is, in substance and effect, an identity of interest, or that the brewing company, considered as an association of individuals, really owns and fully controls the transit company? Or that the payment of the eighth or tenth of the rate is in reality, and in some form, a payment to, or for the benefit of, the shipper? I think sufficient is alleged to show this."

In United States v. Lehigh Valley Railroad Company, 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458, the court found that the allegation of the amended bill showed the existence of control and domination by the parent over the subsidiary to such an extent that the subsidiary was a mere department of the parent and that control and domination were sufficient to bring the parent within the prohibition of the commodities clause of the Hepburn Act, 34 Stat. 584. It concluded that the amended bill should have been allowed and thus reversed the lower court.

Finally, Taylor v. Standard Gas & Electric Company, 306 U.S. 307, 618, 59 S.Ct. 543, 83 L.Ed. 669, was a case involving the issue whether the district court abused its discretion in approving the compromise of the claim of the parent against the subsidiary and a plan of reorganization based upon the compromise, in proceedings under 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The court found that it would be unfair to the preferred stockholders to approve the compromise plan and stated (306 U.S. at page 320, 59 S.Ct. at page 549):

"It is impossible within the compass of this opinion to detail the numerous other transactions evidenced by the books of the two companies many of which were to the benefit of Standard and to the detriment of Deep Rock. All of them were accomplished through the complete control and domination of Standard and without the participation of the preferred stockholders who had no voice or vote in the management of Deep Rock's affairs."

It is readily observed from the first two cases cited that the single purpose of the subsidiary corporation was the violation of a statute, and in the Taylor case, supra, the corporation was dominated to the detriment of third persons. There is no doubt that courts will look to the substance of

ownership and control when there is evidence that the subsidiary corporation was created for the express purpose of violating the provisions of a statute.

In E. Albrecht & Son, Inc., v. Landy, 8 Cir., 1940, 114 F.2d 202, the court found that a selling corporation was a mere blind for the purpose of evading a manufacturer's excise tax. It was admitted that the selling corporation was created because of the imminence of the passage of the tax. The court said (114 F.2d at page 204):

"Although a parent corporation and its wholly-owned subsidiary may for certain purposes and under proper circumstances be treated as separate entities, the finding of the trial court that the Selling Company was merely the adjunct and instrumentality of the Manufacturing Company, organized in an attempt to avoid the excise tax applicable to manufacturers, is amply supported by the foregoing facts. The conclusion reached by the trial court that under such circumstances the parent corporation will not be permitted to use its subsidiary as a device by which it may evade its responsibilities, is the well-established rule."

It is equally true that courts will prevent a parent corporation from proving its claim against a bankrupt subsidiary on a parity with other creditors when there is evidence that the parent corporation has dominated the subsidiary to the injury of third persons, or has used the subsidiary for fraudulent purposes of its own. Stone v. Eacho, 4 Cir., 1942, 127 F.2d 284; Henry v. Dolley, 10 Cir., 1938, 99 F.2d 94; Centmont Corporation v. Marsch, 1 Cir., 1933, 68 F.2d 460. The courts will not destroy the corporate entity merely because there is an identity of control in the parent and subsidiary corporations. Majestic Co. v. Orpheum Circuit, Inc., 8 Cir., 1927, 21 F.2d 720; In re Watertown Paper Co., 2 Cir., 169 F. 252.

The facts before us do not present a case of statutory evasion nor was it alleged that the partnership was created for any fraudulent purpose of the corporation or that injury has resulted to third persons as a result of its formation. In fact the reports of the Referee and Secretary of Agriculture do not even make such a suggestion by implication.

It may be that for certain purposes a parent and subsidiary may be treated as separate entities and yet a court would be justified in looking behind the corporate set up to determine whether for the purpose of administering and enforcing a statute involving a public purpose, it is necessary to treat both the corporation and the subsidiary as one. But even in such cases the courts are hesitant to destroy the corporate separateness of the parent and subsidiary when there is no evidence of evasion or where it is clear that both the parent and subsidiary have a legitimate separate existence. Press Co., Inc., v. National Labor Relations Board, 1940, 73 App.D.C. 103, 118 F.2d 937, certiorari denied 313 U.S. 595, 61 S.Ct. 1118, 85 L.Ed. 1548; Gerdert et al. v. Certified Poultry & Egg Co., D.C., 38 F.Supp. 964.

In the case before us the Secretary of Agriculture had authority to proceed against the corporation and partnership for their separate violations. The Act is comprehensive and covers completely the activities of both businesses. On the basis of what we have said we conclude that the Secretary of Agriculture was in error in treating the partnership as an instrumentality or adjunct of the corporation.

The consequence of our holding is that the Secretary of Agriculture may not attribute a corporate wrong to the partnership. The corporation's failure to grant access to certain of its records, assuming without deciding that the Secretary of Agriculture is correct in this finding, cannot be the basis for the punishment of the partnership. It follows also that insofar as the Secretary of Agriculture sought to punish the partnership for the corporation's alleged acting on the other side of customers' trades without their consent, he was clearly in error.

The respondent contends that without disregarding the separate entities of the corporation and the partnership, the partnership may be punished under Section 2a for a violation of that part of Section 4b(D) which prohibits a member of a contract market from acting on the other side of customers' trades without their consent. Section 2a provides:

"For the purpose of this chapter the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission,

or failure of such individual, association, partnership, corporation, or trust, *as well as of such official, agent, or other person.*" 7 U.S.C.A. § 4.

Assuming, without deciding, that the corporation was a "member of a contract market" and, as such, violated this part of Section 4b(D), the partnership, as agent for the corporation, would be equally responsible for such violation, and thus the Secretary of Agriculture could have punished both the partnership and the corporation for this violation. The complaint, however, does not charge the partnership with violating that part of Section 4b(D) now under consideration. The punishment of the partnership for this wrong is based upon the erroneous theory that the partnership is an adjunct or instrumentality of the corporation. On the basis of the complaint we do not see how the partnership can be held for a violation of this part of Section 4b(D) when it has never been charged with such violation.

[13] The partnership in the complaint is charged with violating that part of Section 4b(D) which reads:

"It shall be unlawful for any member of a contract market * * * to bucket such order, or to fill such order by offset against the order or orders of any other person * * *".

The pertinent facts as regards this allegation are as follows: The partnership often had in its hands simultaneously an order from one customer to buy futures and an order from another customer to sell futures, at the same price. The practice of the partnership was to give one side of the trade to another broker. The partnership thus executed both sides of the trade using two brokers, but every such trade was made by outcry in the ring and the two brokers who had the partnership orders to purchase and sell did not always make the trade with each other. Wells, who acted as the broker for the partnership upon the Exchange, did not consider this offsetting and the evidence shows that a good many other brokers, including the President and other responsible officials of the Exchange, participated in this practice. The petitioners contend that the statute was aimed at bucketing only and that as long as the trades were made on the floor of the Exchange, it was not a violation of the Act. We disagree. It is our opinion that the term "off-setting" has a broader signification than bucketing, and that the setting off of orders in the ring or in a broker's office is proscribed under the Act.

The Secretary of Agriculture has authority under the Act (Ch. 369, § 8a, as added by Ch. 545, 49 Stat. 1500, § 10, 7 U.S.C.A. § 12a) "to make and promulgate such rules and regulations as, in the judgment of the Secretary of Agriculture, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of this chapter". Under the authority granted to him the Secretary promulgated the following regulation:

"Sec. 1.39. A member of a contract market who shall have at the same time both buying and selling orders from different principals for the same commodity for future delivery, in the same delivery month, may execute such orders for and directly between such principals at the market price, if (a) such orders are first offered openly and competitively in the trading pit or ring in accordance with the written rules of a contract market, applying in such cases, and failing of acceptance, *are executed in the presence of an official representative of such contract market appointed to observe such transactions.* * * * *"

The regulation which seeks to effectuate the Congressional purpose is reasonable and within the Secretary's power. It allows the matching of orders in accordance with a clearly defined procedure and prohibits the practice of using friendly brokers for the purpose of off-setting simultaneously buying and selling orders. The Secretary has made it clear in Section 1.39(d) of the regulation that what is permitted shall not be deemed off-setting. The practice pursued by the partnership was a violation of the statute and was, of course, also a violation of the regulation.

The petitioners contend that even if this is so nevertheless it was a common practice on the Exchange and was done with the knowledge and approval of a subordinate officer in charge of the New York office of the Commodity Exchange Administration. In its brief the respondent does not deny this. From our reading of the record, however, it is not clear whether this official merely gave his approval to the practice of acting on the other side of customers' trades without consent or whether he intended to include in his

advice the practice of off-setting as well. We assume, however, that the petitioners are correct in their interpretation of the facts. The regulation in this case, however, is abundantly clear and there is no justification for its violation. The official had no authority to waive the requirements of a regulation and, therefore, his action could not estop the respondent. See United States v. Globe Indemnity Co., 2 Cir., 1938, 94 F.2d 576, 578, certiorari denied 304 U.S. 575, 58 S.Ct. 1047, 82 L. Ed. 1538; Securities and Exchange Commission v. Torr, D.C., 22 F.Supp. 602, 612.

The case of Bartos v. United States District Court for District of Nebraska, 8 Cir., 1927, 19 F.2d 722, does not support petitioners' contention. In that case an attorney was disbarred by the District Court for making beer in his home for the use of himself and family. 13 F.2d 138. The lower court was of the opinion that the offense involved moral turpitude and was a violation of his oath to support the Constitution and the laws of the United States. The Circuit Court, speaking through Judge Lewis, considered that the evidence was wholly insufficient to support either ground. In the concurring opinion of Judge Trieber, the statement is made that the District Court was in error since there was no evidence of an intentional violation of the law because some of the prohibition enforcement officers had publicly stated that the manufacture of beer for one's own use was not an offense. The case is not authority for the proposition that the federal government cannot bring an action for a violation of a statute because of advice given by a subordinate officer. Nor is the case of Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249, in point. The facts before us do not present a case of entrapment by government officials.

The contention that a discretionary power should not be used to suspend a registrant when he accepted and acted upon an interpretation of the law given to him by an enforcement agent loses its force when considered in the light of the regulation which, as we have noted, explicitly prohibits the practice pursued by the partnership. At most this is a mitigating circumstance which may be considered by the Secretary of Agriculture in exercising his discretionary power to suspend for a violation of the Act.

The petitioners assert finally that the power to revoke or suspend a registration under the Act is not to be used to punish for past offenses but only to protect the public interest. We find no merit in petitioners' position. The original Grain Futures Act, 42 Stat. 998, 1002, § 6(b) provided that:

"If the Secretary of Agriculture has reason to believe that any person *is violating* any of the provisions of this Act, * * * or of any of the rules or regulations made pursuant to its requirements, he may serve upon such person a complaint stating his charge in that respect, to which complaint shall be attached or contained therein a notice of hearing, specifying a day and place not less than three days after the service thereof, requiring such person to show cause why an order should not be made directing that all contract markets until further notice of the said commission refuse all trading privileges thereon to such person * * *".

In Wallace et al. v. Cutten, 298 U.S. 229, 56 S.Ct. 753, 80 L.Ed. 1157, the court, in construing Section 6(b) of that Act held the language to be clear and thus concluded that only those violations which were being committed at the time of the complaint could be punished. The court stated that it could not enlarge upon its meaning and punish for past acts, as was the contention of the government. The Commodity Exchange Act which was passed in January, 1936, after the decision in Wallace v. Cutten, supra, included in Section 6b, 7 U.S. C.A. § 9, the words "or has violated", thus giving the Secretary of Agriculture the power to suspend for past violations. The language is clear and we see no justification for interpreting it in any other way. The Secretary has the power under the Act to suspend a person when he finds that a violation of any of the provisions of the Act or any of the regulations duly promulgated by him has been committed. We believe that suspension of a registrant is not primarily punishment for a past offense but is a necessary power granted to the Secretary of Agriculture to assure a proper adherence to the provisions of the Act. Cf. Wright v. Securities and Exchange Commission, 2 Cir., 1940, 112 F.2d 89, 94.

The Secretary of Agriculture suspended the partnership for three violations. We have found that he was in error in punishing the partnership for corporate wrongs. From his conclusions and order

we do not know whether he would have suspended the partnership for ninety days if he had found it guilty only of off-setting, especially in view of the mitigating circumstances above mentioned.

*The order of the Secretary of Agriculture dated December 29, 1941, is set aside and the case is remanded to the Secretary for further proceedings not inconsistent with this opinion.*