BEACON FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff,

v.

FEDERAL HOME LOAN BANK BOARD, Defendant.

No. 57-C-121.

United States District Court
E. D. Wisconsin.
May 28, 1958.

Richard A. McDermott, Milwaukee, Wis., Horace Russell, Chicago, Ill., for plaintiff.

Ray E. Dougherty, Mose Silverman, Washington, D. C., for defendant.

GRUBB, District Judge.

The case is before the court on defendant's motion for summary judgment, under Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A., filed on July 25, 1957, and plaintiff's similar motion for summary judgment, filed on October 21, 1957. No answer has as yet been filed in the action.

The action is one for declaratory relief, injunction, and review of certain proceedings and orders of the defendant, Federal Home Loan Bank Board, hereinafter sometimes called the Board. It is brought pursuant to the provisions of the Home Owners' Loan Act of 1933, as amended, (12 U.S.C.A. § 1464(d) (2)) and Section 10 of the Administrative Procedure Act (5 U.S.C.A. § 1009), and particularly seeks to have Order No. 10,736 of the Board, appointing a conservator for the Beacon Federal Savings and Loan Association, hereinafter sometimes called Beacon, declared null and void.

On March 20, 1956 the Board, acting under the provisions of 12 U.S.C.A. § 1464(d) (2), issued Order No. 9414 appointing a Supervisory Representative in Charge of Beacon. On August 15, 1956 an administrative hearing was begun in Milwaukee to determine whether grounds existed for the appointment of a conservator. The hearing examiner, in his recommended decision, decided that such grounds did exist, and on May 21, 1957 the Board issued Order No. 10,736 which adopted the recommended decision, made a number of additional findings and conclusions, and appointed a conservator for Beacon. Beacon has filed this suit to review that administrative action.

12 U.S.C.A. § 1464(d) provides in pertinent part as follows:

"(d) (1) * * * It [the Board] shall by formal resolution state any alleged violation of law or regulation and give written notice to the association concerned of the facts alleged to be such violation, except that the appointment of a Supervisory Representative in Charge, a conservator or a receiver shall be exclusively as provided in paragraph (2) of this subsection. Such association shall have thirty days within which to correct the alleged violation of law or regulation and to perform any legal duty. If the association concerned does not comply with the law or regulation within such period, then the Board shall give such association twenty days' written notice of the charges against it and of a time and place at which the Board will conduct a hearing as to such alleged violation of duty. * * * After such hearing and adjudication by the Board, appeals shall lie as is provided by the Administrative Procedure Act, and the review by the court shall be upon the weight of the evidence. Upon the giving of notice of alleged violation of law or regulation as herein provided, either the Board or the association affected may, within thirty days after the service of said notice, apply to the United States district court for the district where the association is located for a declaratory judgment and an injunction or other relief with respect to such controversy, and said court shall have jurisdiction to adjudicate the same as in other cases and to enforce its orders. * * *

"(2) The grounds for the appointment of a conservator or receiver for a Federal savings and loan association shall be one or more of the following: (i) insolvency in that the assets of such association are less than its obligations to its creditors and others, including its members;

(ii) violation of law or of a regulation; (iii) the concealment of its books, records, or assets or the refusal to submit its books, papers, records, or affairs for inspection to any examiner or lawful agent appointed by the Federal Home Loan Bank Board; and (iv) unsafe or unsound operation. The Board shall have exclusive jurisdiction to appoint a Supervisory Representative in Charge, conservator, or receiver. If, in the opinion of the Board, a ground for the appointment of a conservator or receiver as herein provided exists and the Board determines that an emergency exists requiring immediate action, the Board is authorized to appoint ex parte and without notice a Supervisory Representative in Charge to take charge of said association and its affairs * * * The Board shall have the power to appoint a conservator or receiver but no such appointment of a conservator or receiver shall be made except pursuant to a formal resolution of the Board stating the grounds therefor and except notice thereof is given to said association stating the grounds therefor and until an opportunity for an administrative hearing thereon is afforded to said association. Such hearing shall be held in accordance with the provisions of the Administrative Procedure Act and shall be subject to review as therein provided and the review by the court shall be upon the weight of the evidence. * * *"

A number of legal points, exclusive of the merits of the case, have been raised. Beacon claims that the Board's summary and ex parte action, under 12 U.S.C.A. § 1464(d) (2), in appointing a conservator was an abuse of discretion. More specifically, it is contended that the Board abused its discretion in proceeding under 12 U.S.C.A. § 1464(d) (2) rather than under § 1464(d) (1), under which Beacon would have been given notice of alleged violations and opportunity to correct

them before further and more severe action would be taken.

■ An examination of § 1464(d) (1) and (2), reveals that on its face the statute gives the Board an absolute discretion to proceed under either § 1464(d) (1) or § 1464(d) (2), if, in the latter instance, "in the opinion of the Board, a ground for the appointment of a conservator or receiver as herein provided exists and the Board determines that an emergency exists requiring immediate action, * * *"

The decision of the Board to proceed under § 1464(d) (2) is not reviewable as such. The statute provides for judicial review at the conclusion of the administrative hearing. At that time a determination is to be made on the issue whether or not grounds exist for the appointment of a conservator or receiver. Any question as to the correctness of the Board's opinion, at the time when it summarily appointed a Supervisory Representative in Charge, that ground for the appointment of a conservator or receiver existed and that an emergency existed which required immediate action, is merged in the issue before the court on review of the administrative action. Fahey v. Mallonee, 1947, 332 U.S. 245, 253–254, 67 S.Ct. 1552, 91 L.Ed. 2030; Beacon Federal Sav. & Loan Ass'n v. Federal Home Loan Bank Board, D.C. E.D.Wis.1956, 143 F.Supp. 534, 535–536.

■ Beacon's attack upon the Board's action on the ground of alleged lack of emergency, particularly in that Beacon was solvent when the Supervisory Representative in Charge was appointed, is also poorly taken for the reasons just stated. In addition, neither the statute nor common sense makes insolvency a prerequisite to action under § 1464(d) (2). "It is the duty of a regulatory agency to prevent potential injury by stopping unlawful practices in their incipiency." Daniels v. United States, 7 Cir., 1957, 242 F.2d 39, 42. Section 1464 (d) (2) specifies four grounds for the appointment of a conservator or receiver, and hence of a Supervisory Representa-

tive in Charge: Insolvency, violation of law or regulation, concealment of books, and unsafe or unsound operation. Insolvency is but one of four grounds, and under the statute, the Board need only be of the opinion that "a ground" exists. (Emphasis supplied.)

■ Order No. 9414 (Ex. 169 at R. 1059), dated March 20, 1956, appointing a Supervisory Representative in Charge, was not certified to have been adopted by the Board. Beacon contends that the lack of certification constitutes a fatal defect in that action and in all subsequent acts and proceedings of the Board because of the requirements of 24 C.F.R. § 147.2, Rules and Regulations of the Savings and Loan System:

"* * * The formal resolution of the Board so appointing any such Supervisory Representative in Charge shall state the ground or grounds which, in the opinion of the Board, exist for the appointment of a conservator or receiver and the reason or reasons which the Board determines exist requiring such immediate action. The Secretary to the Board shall mail a *certified copy* of such resolution to the address of the association as it shall appear on the records of the Board and to each director of the association known by the Secretary to be such, * * *" (Emphasis supplied).

The authority cited by Beacon is inaccurately cited. Section 147.2 in the form relied upon by Beacon did not become effective until June 26, 1956, three months after order or resolution No. 9414 was issued; see 21 Federal Register 4548. Before June 26, 1956 there was no regulation specifically covering the procedure upon appointment of a Supervisory Representative in Charge. Desirable as certification may be as an assurance that official action has been taken, it cannot be said that the Board failed to follow subsequently self-imposed procedure. The subsequent actions of the Board leave no doubt as to the authenticity of Order No. 9414.

■ There exists a dispute between the parties as to the nature of this court review. Beacon's claim is that the court has the jurisdiction and obligation to evaluate the evidence and pass on the question *de novo*. This claim is not supported by the statutory and case authority. Section 1464(d) (2) provides:

"* * * Such hearing shall be held in accordance with the provisions of the Administrative Procedure Act and shall be subject to *review* as therein provided and the review by the court shall be upon the weight of the evidence. * * *" (Emphasis supplied.)

The method of approach and standard applicable to a review on "the weight of the evidence" have been explained by the Court of Appeals for the Seventh Circuit in two cases dealing with section 6(b) of the Commodity Exchange Act, 7 U.S.C.A. § 9, which also provides for review on the weight of the evidence. In 1948 the Court stated, General Foods Corporation v. Brannan, 7 Cir., 1948, 170 F.2d 220, 223–224:

"Thus the standard to be employed is something other than the 'substantial evidence rule' controlling in the review of other administrative orders. In Nichols & Co. v. Secretary of Agriculture, 1 Cir., 131 F.2d 651, the only case called to our attention in which the provision has been discussed, the court indicated that a reviewing court was authorized to consider the evidence de novo. Whatever the requirement be labeled, we think it means that petitioners are entitled to have the order vacated unless this court concludes that it is sustained by the weight of the evidence, and to us that means the preponderance or greater weight."

In Great Western Food Distributors, Inc., v. Brannan, 7 Cir., 1953, 201 F.2d 476, 479–480, the Court of Appeals enlarged upon its analysis:

"However, while this court must examine the sufficiency of the evidence, and this may entail a careful consideration of the proof, see Nichols & Co. v. Secretary of Agriculture, 1 Cir., 131 F.2d 651, we should be mindful of the practical difficulties and pitfalls presented in attempting to redetermine, from an inanimate record alone, issues such as these here presented. Often the 'most telling part' of the evidence is not apparent from the printed page, 'for on the issue of veracity the bearing and delivery of a witness will usually be the dominating factors'. National Labor Relations Board v. Universal Camera Corp., 2 Cir., 190 F.2d 429, 430. Thus, 'we may not disregard the superior advantages of the examiner who heard and saw the witnesses for determining their credibility, and so for ascertaining the truth.' Ohio Associated Tel. Co. v. N. L. R. B., 6 Cir., 192 F.2d 664, 668. * * *

"It would seem, then, that the function of this court is something other than that of mechanically reweighing the evidence to ascertain in which direction it preponderates; it is rather to review the record with the purpose of determining whether the finder of the fact was justified, i. e. acted reasonably in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported his findings. To go further is to disregard the 'most telling part' of the evidence. National Labor Relations Board v. Universal Camera Corp., supra. * * *"

Thus, this review under 12 U.S.C.A. § 1464(d) (2) is on the weight of the evidence, by which is meant the preponderance or greater weight, something other than substantial evidence. The court must review the record to determine whether or not the findings are supported by the weight of the evidence, for if they are not, they cannot stand. But Congress did not intend the proceeding before the court to be a trial *de novo* on a written record. It is a review, and accordingly

proper weight must be given to the opportunity of the finder of fact to observe the witnesses and evaluate their credibility. Therefore, when reviewing on the weight of the evidence, the standard to be used in order to avoid a determination based solely on the dry and lifeless, and therefore imperfect record, and instead to give effect to the superior opportunities of the finder of fact is: Could a man reasonably conclude from the evidence in the record, but as perfected or filled out by an opportunity to observe the demeanor of the witnesses and draw reasonable inferences therefrom, that the weight of the entire evidence supported the findings now before the court?

■ The general rule is that courts reviewing the findings and conclusions of administrative agencies will give weight on doubtful questions to their informed judgment as experts in their fields. See Moog Industries, Inc., v. F. T. C., 1958, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370; Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Federal Security Adm'r v. Quaker Oats Co., 1943, 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724; United States ex rel. Ciannamea v. Neelly, 7 Cir., 1953, 202 F.2d 289. This rule applies as well to reviews on the weight of the evidence as to reviews on substantial evidence or other standards. It refers not to the standard of proof or evidence but to that competence or expertise in its area which is legally presumed to reside in every duly constituted administrative agency. In this case the rule is applicable, particularly to the weight to be given the Federal Home Loan Bank Board's determination that certain conduct or actions, assuming them to be proved by the weight of the evidence, constitute a violation of law and regulations or constitute unsafe or unsound operations for a Federal savings and loan association.

■ Under section 1464(d) (2) the final remedy provided to correct unlawful activities of a Federal association is appointment of a conservator or receiver. Whether the Board will make use of this remedy, assuming that a violation has been proved, is a question reserved by the statute to the discretion of the Board. The Board's determination to appoint a conservator or receiver on the basis of the violations proved is, however, subject to review by the court according to the following standard, set down in Daniels v. United States, supra (242 F.2d at page 42):

"* * * The Administrative decision as to the remedy should be sustained unless the remedy selected has no reasonable relation to the practice found to exist. * * *"

In this case the Board had 172 exhibits and much testimony. To review in detail this record would unduly extend this opinion. The following are part of the facts which the Board had before it in reaching its determination. All dates are the year 1955 unless otherwise indicated.

About the summer of 1954, Beacon's directors were considering acquiring new offices. Sydney Eisenberg, a Milwaukee attorney, was, for practical purposes, owner of the Laneil Realty Corporation, hereinafter called Laneil. Eisenberg negotiated with parties herein called collectively the Sweds for the purchase of properties owned by the Sweds at Second and Wells, hereinafter referred to as Second, and at Fourth and Wells, hereinafter referred to as Fourth. Arrangements were made for the purchase by Laneil of Fourth for $200,000 and Second for $500,000, less 5% in lieu of brokerage fee, or $190,000 and $475,000 net respectively. Eisenberg offered Second to Beacon for $500,000. Henry Blume, an attorney, was president and a director of Beacon, and Ernst Zaeske, vice-president, secretary and a director of Beacon. Blume and Zaeske telephoned Beacon's other directors and obtained an informal approval of the purchase of Second for $500,000, subject to appraisal and the executive committee's approval. Laneil had a purchase agreement from the Sweds on Second for $475,000. It applied for a mortgage loan of $480,000. Laneil assigned its purchase contract on Second

to Beacon. No mortgage or note was ever executed. Blume, Zaeske, and a Beacon director named Meyer, appraised Second at $700,000 on January 13, the date that Laneil had executed the contract to buy it from the Sweds for $475,-000. The existence of this contract was known to Blume at the time. Beacon's executive committee informally approved the purchase of Second.

Laneil also executed a purchase agreement for Fourth for $190,000. This agreement called for $19,000, earnest money, and the balance of $171,000 by March 31. Laneil applied to Beacon for a mortgage loan of $150,000 on Fourth and executed a mortgage note for that amount in connection with the application. Blume, Zaeske, Meyer, and Slocombe, another director of Beacon, appraised Fourth at $250,000, Blume having knowledge of the contract purchase price.

Laneil quit-claimed property at 770 N. Marshall to Beacon as collateral security on both Fourth and Second. This property was subject to a first mortgage held by the Bankers' Life Insurance Company. Laneil also gave Beacon a quit claim to property at 803–813 E. Wells Street as collateral security on Fourth. At that time Beacon held the first mortgage on this property in the sum of $242,103.40. The additional permissible loan amount under the regulations was $11,229.23. There was also surrendered as collateral on both the Fourth and Second loan, life insurance with cash surrender value of about $2,500.

On January 14, Laneil delivered an option to Beacon to buy Second for $500,000 on or before March 30, "in consideration of making of a loan of $480,000." Beacon's directors informally approved such loan on Second. A Beacon check for $47,500, signed by Blume, was released to the Sweds in payment of earnest money on Second. A mortgage loan account in the name of Laneil was set up on Beacon's books in the amount of $480,000, and a corresponding loan-in-process account for the same amount. The $47,500 Beacon check released to the

Sweds was entered as a disbursement from the loan-in-process account, after which it showed a balance of $432,500.

Laneil and another Eisenberg corporation, Knapp Street Realty, assigned three Beacon savings accounts to Beacon as collateral on Fourth and Second, one of which was subject to a prior assignment to the Bank of Commerce to secure an $8,000 loan. A mortgage loan account and a corresponding loan-in-process account in the name of Laneil were set up on Beacon's books for $200,000 on Fourth.

A Beacon check for $19,000 was delivered to the Sweds as earnest money payment on Fourth.

Beacon's executive committee approved the $480,000 loan to Laneil on Second on January 18 with the notation, "Hold $200,000 for improvements or $280,000 without improvements." There was no indication as to the character of the improvements or their value. It also approved a $200,000 loan to Laneil on Fourth with the notation, "Hold $50,000 for improvements or $150,000 loan without improvements," also without indication as to the improvements. On January 19 the board of directors took similar action. The board of directors also directed the management to entertain offers for the purchase of Beacon's office, 769 North Water Street.

February 2, Beacon's executive committee authorized the purchase of Second for $500,000, $475,000 to the Sweds and $25,000 to Laneil.

February 4, the Downtown Development Corporation, hereinafter called Downtown, recorded its Articles of Incorporation. The capital stock was 800 shares no par common, each to be sold for $10. The original subscribers were Eisenberg—300 shares, Blume—100 shares, Zaeske—100 shares, and 300 shares to other people.

February 7, a $20,000 check was given by Beacon to Laneil in connection with Second. It was immediately endorsed by Eisenberg and turned over to Downtown as a loan. On February 7 the Sweds

gave Beacon a warranty deed to Second. On that day Beacon allowed Knapp Street Realty to withdraw $1,000 from a savings account which had been assigned to it as collateral. This withdrawal reduced the balance of account No. 6130 to $4665.72. This withdrawal was by check made payable to Downtown. On February 8, Beacon gave another check, this one for $5,000, to Laneil in connection with Second.

February 14, the Articles of Incorporation of the Atomic Security Corporation, hereinafter called Atomic, were filed. They provided for 800 shares of capital stock at $10 per share.

February 15, Remeeus Real Estate sent Blume a letter offering to do the managing and leasing of "your new building" at Second for a fee of $1,000 per month, plus expenses.

February 16, Beacon's directors approved the executive committee's minutes authorizing the purchase of Second for $500,000. Beacon's board also resolved to lease the property to Atomic for 99 years, requiring Atomic to erect a building for $3,000,000 with Beacon taking a lease back on the first and second floors, and to petition the Home Loan Bank Board for approval of this plan. It re-advanced $7,000 to Laneil on 803–813 E. Wells. The previous monthly payments on the old mortgage were not increased. The money was issued in two checks, one for $5,000 which was immediately endorsed over to Atomic, and the other for $2,000 which was endorsed to Downtown.

February 17, Trans-America Enterprises Incorporated, hereinafter referred to as Trans-America, filed its Articles of Incorporation.

March 8, the Board approved the purchase of Second based upon the assumption that the purchase and rental were contemplated solely for the purpose of acquiring office quarters and not for the purpose of investment.

March 16, Beacon sold its office building to Trans-America on land contract for $100,000 with a down payment of $10,000 and the balance in monthly payments of $650, including interest at 6%. It took a lease back for three years at $1,000 a month, it to have the privilege of cancelling the lease. Beacon immediately treated the unrealized profit on this sale as profit and credited it to the Federal Insurance Reserve Account.

March 17, Downtown's directors resolved to purchase Fourth for $225,000.

March 31, Beacon paid Remeeus Real Estate $1,000 for leasing services relative to the proposed building on Second.

April 4, Downtown paid Beacon $42,-423.13 on behalf of Laneil, showing the payment to be an investment in Fourth, and Beacon's check for $131,000, representing the remainder of Beacon's $150,000 loan on Fourth, was delivered to the Sweds together with the money advanced by Downtown. The Sweds gave Laneil a warranty deed to Fourth.

April 20, Beacon's directors employed Downtown, effective April 1, as leasing agent for the building to be built on Second at $2,000 per month plus expenses. At that time Blume still had in his possession the February 15th letter from Remeeus offering to perform those services for $1,000 a month plus expenses. Under this resolution Beacon paid Downtown $6,000 on this contract.

April 29, Laneil conveyed Fourth to Downtown for $225,000.

May 18, Beacon's board, varying the February 16 resolution concerning Second, resolved to sell Second to "a 'X' Corporation" for $850,000, subject to certain terms, among them being $50,000 as the maximum to be spent by Beacon for surveys, etc., the "X Corporation" to agree to construct an office building to be approved by Beacon, Beacon to have a thirty-year lease in the first four floors at certain rates, Beacon to have an option to purchase if it paid advance rental up to ten years.

May 23, the owners of a plot 150 feet by 298.36 feet at Sixth and Wisconsin, hereinafter referred to as Sixth, executed an option for its purchase for $1,000,000 and agreed to pay the optionee 5%, commission on the sales price. This option

was assigned to Downtown, reserving one-half of the commission.

May 27, the owners of Sixth executed a buy-and-sell agreement with Downtown for $1,000,000, receiving $5,000 as earnest money and crediting $50,000 as against the real estate commission. The owners of the option received from Downtown $5,000 in cash and at a later date, $20,000 in Downtown stock. The other half of the commission went to the order of Blume-Zaeske and was eventually paid to Atomic on June 7.

May 31, Beacon sold Second to Atomic on land contract at a price of $850,000. The down payment made on this contract was $5,000. At this time, $39,356.82 of the $50,000, authorized for survey work on Second, was unspent. However, the land contract between Beacon and Atomic contained no reference to crediting the unspent remainder to Atomic. It contained no reference to any leasing of space in the proposed building by Beacon. Downtown and Atomic approved an agreement between them whereby Downtown became Atomic's exclusive agent for leasing, managing, and financing all property of Atomic. This agreement was executed in writing on June 30. Also on May 31, Downtown resolved to sell its interest in Sixth to Atomic at a profit of $125,000.

June 3, Beacon's executive committee, Blume, Zaeske, Meyer, and Slocombe, authorized Eisenberg to act as Beacon's agent to purchase or secure a long-term lease to a part of the property at Sixth and gave him a Beacon check for $125,000 to be used as the down payment. On the same day, Downtown received $125,000 from Eisenberg as a "deposit on real estate".

On June 6, Downtown made a $45,000 payment on Sixth, and received a land contract covering that property.

June 9, Beacon credited to Atomic's escrow account $39,356.82, being the unused balance of $50,000 authorized to be expended for surveys and other preliminary work on Second. This reduced Beacon's paper profit on Second to $300,000.

June 15, Beacon's directors passed a resolution designating Atomic as the "X Corporation" referred to in the minutes of May 18. It set forth that Atomic had purchased Sixth and was willing to build a building which would house Beacon's offices, resolved that Beacon enter into a lease for 20 years on portions of the building, setting forth the rental per square foot, and "That the Association deposit $300,000 for future rent for which it is to receive a credit in a manner to be determined upon execution of a lease, the terms of which to be mutually agreed upon", Beacon also to be given an option to renew the lease.

June 16, Beacon transferred $175,000 to Atomic's escrow account. This, plus the $125,000 given to Eisenberg, aggregated $300,000. At this time there was no construction contract in existence for the erection of the building on Sixth, there was no performance bond, and at that time Atomic was capitalized for $8,000. On this date, Blume paid $100,-000 out of Atomic's escrow account to Downtown. It was recorded as "Deposit on 6th and Wis.".

June 29, Blume issued a Beacon check for $35,000 in favor of Downtown against Atomic's escrow account. There was an entry describing this as 3500 shares common stock of Downtown, and Downtown issued its certificate for 3500 shares of stock to Atomic. The certificate of amendment increasing Downtown's capitalization had been filed, pursuant to the Wisconsin Statutes with the Register of Deeds about June 22. Atomic deposited its certificate of Downtown's stock with Beacon as collateral security for the purchase of Second.

July 5, Atomic assigned the land contract on Sixth to Beacon as collateral security for Beacon's deposit of $300,000.

July 29, Downtown paid Beacon the balance owing on the Fourth mortgage of $143,815.96. Beacon returned the pledged security.

August 1, $75,000 was paid by Beacon's check from the Atomic escrow account on the land contract of Sixth. Thus, on this date Beacon had completely disbursed the

$300,000. Its only security was an assignment of the land contract.

August 18, Atomic and Beacon executed a lease-option agreement relating to part of the property at Sixth, 90 feet by 110 feet. Under this agreement, Atomic agreed to erect an office building costing not less than $1,500,000, plans to be approved by Beacon. Beacon was to lease, for twenty years, parts of the first three floors at an annual rental of $94,660, rent payable one year in advance. The $300,000 previously paid by Beacon was designated payment for an option to purchase the premises for an additional million dollars, subject to adjustment with reference to costs of the building. The appraisals of the real estate upon which the building was to be built ranged from $345,000 to $411,000.

October 5, Horace Russell, a director of Beacon and one of its legal advisers, requested the opinion of the Board on a proposed renewal lease and option agreement to be executed between Beacon and Atomic with reference to Sixth. Under this agreement Beacon would advance an additional $300,000 to Atomic in return for alleged additional advantages, the most important of which was that the total of $600,000 which Beacon would have paid out could be applied against rent payments after the first twenty years of the lease. Under this proposed renewal lease and option agreement, Beacon was also to have an option to purchase the building.

By October 5 construction had begun at Sixth. On October 18, the defendant requested that Beacon refrain from any further commitment of its assets in connection with transactions involving Downtown or Atomic. On October 19, Beacon's board of directors resolved to execute the renewal lease and option agreement "upon the advice of the Federal Home Loan Bank Board that there is no objection". At about this time construction of the building at Sixth was stopped.

December 21, Beacon's board of directors transferred out of the Federal Insurance Reserve Account to a Special Reserve For Unearned Income Account both the unrealized profit from the sale of its offices at North Water Street and $295,000 unrealized profit from its sale of Second to Atomic.

December 31, Downtown's records showed that it paid dividends, of which Blume received $1,800, his wife, $500 and Zaeske, $1,300.

The record shows that during 1955 Blume acquired from retained discounts on title examinations, abstract extensions and title policies the sum of $8,475.42. The record further shows that Atomic had made no payments on its land contract with Beacon since March 14, 1956.

March 15, 1956, Beacon received a copy of the report of the supervisory examination by the defendant.

March 20, 1956, defendant issued an order appointing a Supervisory Representative in Charge of Beacon.

August 15, 1956, an administrative hearing of the Board was commenced to determine whether grounds existed for the appointment of a conservator over Beacon.

May 20, 1957, the Board issued the order adopting the recommended decision of the hearing examiner making additional findings and conclusions and appointing a conservator over Beacon.

On the question of the intent of the parties at the time of these transactions, the board had before it letters of Blume, portions of which are quoted below. The court wishes to make clear that this opinion is not to be construed as casting any doubt or intimation of wrong-doing on Mr. Zeckendorf or the firm of Webb & Knapp. No charges were made against them and no findings were made against them. There is no evidence in the record to indicate any wrong-doing on their part.

Letter of April 15, 1955 from Blume as President of Beacon to Elliot H. Binzen, Vice-President of Webb & Knapp, New York:

"Enclosed please find preliminary figures of the Beacon Federal Sav-

ings Building; also the plan of operation.

"You will note that this plan involves no cash on the part of either Webb & Knapp or our group here. The legal part is as follows: We have formed the Atomic Security Corporation, capitalized with 800 shares at $10.00 per share. Four of our group have paid $8,000.00. Three individuals $1,000.00 each, and the fourth, $5,000.00. The fourth man will sell 400 shares for $4,000.00 to Webb & Knapp. This therefore makes you 50% with the four Milwaukeeans. The Atomic Security Corporation secures the 99 year lease and agrees to erect the building. The ground rent is to be subordinated in accordance with this agreement.

"I would like your opinion on this plan, and any suggestions you may have to offer; also copy of a proposed letter of intent for tenants to sign. And I think you might set up in your own words what our deal is. As I understand it, we are to secure the first 50% of the national lease tenants. You are to secure the remaining 50%, although our leasing agent, Remeeus, will assist. In the event there should be any expense involved, Webb & Knapp and the Milwaukee group go 50-50, although it is not my intention that anybody puts up any money other than the total of $8,000.00, which is the capitalization of the Atomic Security Corporation."

Letter of April 29, 1955 from Blume as President of Downtown to William Zeckendorf, President of Webb & Knapp:

"The U family, largest owners of downtown Milwaukee property, have had conferences with me for the past two days, and there is a distinct possibility that they will offer me an option for six months on very desirable downtown properties.* On one of these pieces of property I

think we have a possible tenant in Montgomery Ward, * * *

"I am also mailing * copy of lease to be executed between Beacon Federal and Atomic Security. Elliot Binzen * has the details of Atomic Security Corporation. This intermediate corporation is necessary because the Federal Home Loan Bank does not want me to sign on both sides of the lease. This corporation has 800 shares. If desired, Webb and Knapp may have 400 shares. The investment is nominal, to-wit: $10.00 per share. The company stock is fully paid in and we have the $8,000.00 in the bank.

"The Atomic Security Corporation will give a building contract to the Downtown Development Corporation, and we should make from 2% to 5% on the construction, plus some other profits which you no doubt know about. It is my suggestion that when the building is erected, the Atomic Security assign their 99 year lease to the Downtown Development Corporation and dissolve. The Downtown Development Corporation has a leasing contract with the Beacon whereby the Beacon pays Downtown Development Corporation $2,000.00 a month plus expenses for advertising, etc. The Downtown Development Corporation employes [sic] the Remeeus Company for $1,000.00 per month to do the work; so there is a net profit of $1,000.00 a month.

"I am also mailing * a breakdown of the Beacon Federal Building. It would appear to me that there will be a profit of approximately $200,000.00 a year to be divided, and we may be able to do better. It will be ten years before the Beacon's reserve will be sufficient for us to purchase our own building."

Letter of July 1, 1955 from Blume as President of Downtown to Art Rubloff,

---

* The original letter shows a correction. We have quoted the original as corrected.

associated in some manner with Webb & Knapp:

"The land at N. 2nd and Wells and the land at N. 6th and Wisconsin is owned by the Atomic Security Corp. However they have drawn a contract with the Downtown Development Corp. which provides that the Downtown Development Corp. shall do the leasing, management, financing, etc., and a copy of this contract is also attached. The Downtown Development Corp. will apply to the State Securities Commission for registration of its stock, to-wit: 120,000 shares, and for a $2,000,-000.00 5% Debenture issue. The proceeds of the Debenture issue is to be used to buy the furnishings for the Sheraton Hotel. The Sheraton pays 7% of the cost of the furnishings for 25 years, which is sufficient to net a return of approximately 4¾% and also amortize the principal investment.

"It is my opinion that if Bill, you, and I buy the land for $1,150,000.00, which is the resolution of the Atomic Security Corp. that it will sell the land for that amount, that this becomes a good investment since the land is purchased on land contract, of which $225,000.00 has been paid and $900,000.00 is still due, payable $100,000.00 a year, next payment being due May 27, 1956, a $100,-000.00 payment being due May 27, 1957, and $700,000.00 being due May 27, 1958; interest at the rate of 4¼%, and interest waived from start of construction.

"It is my belief that this fee 'land', with the building on it, and a lease from Sheraton and Beacon is worth better than $2,000,000.00, and we should be able to sell that land or the interest in the land for better than $2,000,000.00, and to make a very substantial return with little investment."

Letter of October 14, 1955 from Blume as President of both Beacon and Downtown to Design, Incorporated of St. Louis:

"On motion duly made, seconded and unanimously carried, it was resolved that the Association make the construction loan on the Beacon Federal Savings Building at 60% of appraised value.

"I mailed you previously a photostat copy of Horace Russell's opinion that we are so authorized. We can now loan a million three. However, I am timing the date of the construction loan to be December 1st when we will be able to make a million four. There has been previously paid by the Beacon on an option, $300,000.00.

"I am enclosing herewith a Renewal Lease and Option Agreement under the terms of which the Beacon will pay another $300,000.00. This therefore makes a total of two million dollars which the Beacon puts into the project; $600,000.00 on the option, and $1,400,000.00 on the construction loan; in addition thereto, on December 19th the Beacon will pay $95,000.00 one year's advance rent. If you are successful on December 1st you will pay the Atomic Security Corp. $750,000.00 as the purchase price of Parcel 2. In January the City will pay upwards of $300,000.00 for the 40 feet they are taking for street widening. This makes a total of $3,145,000.00, to which may be added a second mortgage to be taken by the Bank Building & Equipment Corp. of $300,000.-00 if necessary, bringing the total receipts to $3,445,000.00.

"According to present plans, we expect to pay you for architect's fees and general contract, approximately $1,800,000.00. We will be paying one million for the land. This makes a total of $2,800,000.00 and would leave if necessary, about $645,000.00 to take care of leasing and financing fees which should not exceed $150,-000.00, and the rest can spill over into 2nd and Wells so that we will

have a substantial equity there for financing."

The Board found that Beacon entered into unsafe and unsound operations by entering into a series of interrelated transactions involving properties at Second, Fourth and Sixth; that these transactions were unsafe and unsound, were designed to finance and give credit standing to large-scale speculative ventures of Blume, Zaeske and associates and corporations in which they and their associates had an interest; that they were designed to divert Beacon's assets to their personal gain and profit. The court is of the opinion that this finding is in accord with the weight of the evidence.

The court also is of the opinion that the finding that Downtown made $125,000 profit on Sixth as a result of unsafe and unsound operations by Beacon is sustained. This profit inured to the benefit of Blume, Zaeske and their associates through Downtown.

The court is of the opinion that the finding that Beacon engaged in unsafe financing and leasing arrangements with reference to Sixth is sustained.

The finding with reference to the $25,000 commission money ultimately paid to Atomic on the sale of Sixth to Downtown is sustained in the opinion of the court, as is the finding that Beacon paid in excess of $25,000 for Second. These are both part of the scheme. Some of the individual matters, if they stood alone might be defended as at most being poor judgment, but where they fit into an entire scheme or operation, they take a different light and become indefensible.

With reference to the $39,356.82 credited to Atomic's escrow account by Beacon on June 9, the findings are sustained that Beacon was under no legal obligation to Atomic to make any such payment or to give it credit for any of the unexpended part of the $50,000 that Beacon's Board had authorized for surveys.

With reference to the $2,000 a month leasing fee to be paid by Beacon to Downtown with reference to Second, the record is clear that Blume had Remeeus' offer to perform these services at $1,000 a month. This was not shown to the directors when they engaged Downtown to do it for $2,000 a month. Plaintiff claims that Remeeus was sick and could not do the work. Nevertheless, Downtown engaged him for $1,000 a month on his offer to do it for that. There was not a full disclosure to the directors of Beacon and its records do not disclose that they had knowledge of such arrangement. The court is of the opinion that that finding is sustained.

The court is of the opinion that the findings with reference to the May 18th resolution of Beacon's directors are sustained. The fact that the resolution referred to an "X Corporation" instead of designating it, indicates another part of the scheme and concealment. Without even knowing the identity of the purchaser, the directors of Beacon authorized the payment of ten years' rent in advance. At that time there were no plans, specifications or financing arrangements.

Regarding the sale of the property at 769 North Water Street to Trans-America, this apparently was part of the scheme. The court cannot say that the Board decided against the weight of the evidence in holding that Trans-America had not shown enough financial responsibility to justify conveying the property to it even by land contract on such a small down payment.

The finding with reference to the resolution of the board of directors of Beacon of February 16, is, in the opinion of the court, sustained. That resolution indicates that the Association was going to buy, when it had already purchased, Second. It was certainly inaccurate, to say the least, and misleading, if not part of an attempt to conceal.

Similar observations should be made with reference to the finding of the Board concerning Beacon's resolution of June 15.

The findings of improper book entries with reference to the unrealized profit of $55,225 from the sale of 769 North Water Street and $295,000 from the sale of Second are sustained.

The finding that Beacon's books were kept in such a manner as to falsely reflect its financial condition because of the recording of Beacon's loan on Fourth for $50,000 more than the amount of the mortgage note is sustained.

The finding that Beacon either kept its books in such manner as to falsely reflect its financial condition by recording the loan on Second for $200,000 more than the amount actually granted, or in the alternative, that Beacon granted a loan on Second in excess of the maximum permitted percentage of value is sustained.

The finding that Beacon kept its books in such manner as to falsely reflect its financial condition by giving a fictitious asset value to the $300,000 credited by Beacon to Atomic's escrow account is sustained by the weight of the evidence. By the time Beacon completed its disbursement of this $300,000 to Atomic's credit on June 16, there was in existence no lease between Beacon and Atomic, no final plans and specifications with reference to the proposed building on Sixth, no performance bond for the erection of the building and no binding arrangements for underwriting the $2,000,000 of proposed debentures which Downtown would use on the project at Sixth.

The analysis of the financial accounts of Downtown made by the Board sustain its finding that Downtown acquired Fourth at a cost of less than $60,000 to itself, and more than $130,000 to Beacon with the possible exception of items not having an effect of more than $4,000. The basic finding is sustained with the possible exception of a comparatively small amount of money.

The record sustains the Board's finding that on April 12, 1956, Blume and Zaeske made false representations to the Board with reference to the owning of Downtown. It might be that it was the intention at that time to increase the capital stock of Downtown but that was not the representation made to the Board.

The court is of the opinion that the findings with reference to the unsecured loans of $19,000 on Fourth and the $47,500 on Second are sustained.

A closer question is presented with reference to the finding that loans were made for an excessive term on 803–813 East Wells Street. This is a minor matter considering the picture as a whole. It is a matter which is peculiarly within the knowledge of the Board as to how these things should be handled, and the court cannot say that the finding is not sustained by the evidence.

The finding of the Board that Beacon violated regulations by granting readvances totaling $7,000 on 803–813 East Wells Street because this action had the effect of increasing a loan on these properties above the maximum permitted percentage of value is not sustained by the weight of the evidence. However, it is clear that the transaction involved an unlawful release of security by Beacon and to that extent was a violation of the regulations. The finding of the Board in that respect is sustained by the weight of the evidence.

Blume's retention of discounts on abstract continuations and title policy examinations was certainly violative of the spirit of the regulations. The Board found that they violated the letter of the regulations. Considering that this is a field in which the Board is expert, the court feels that it cannot set aside that finding.

The Board's finding that Beacon had a management which was unsafe or unfit to manage a Federal savings and loan association is clearly supported by the weight of the evidence as is evidenced by the series of unlawful and unsound transactions upon which Beacon's board permitted the Association to enter.

Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Defendant is to prepare an order in conformity with this opinion, submitting it to plaintiff's counsel for approval as to form only.